KHAM & NATE'S SHOES NO. 2, INC., Debtor–Appellee,

v.

FIRST BANK OF WHITING, Defendant–Appellant.

No. 89–3001.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1990.

Decided July 19, 1990.

Rehearing and Rehearing En Banc Denied Oct. 12, 1990.

John T. Cusack, Gordon B. Nash, Jr., Brian A. Bosch, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff-appellant.

JoAnn M. Hornak, Lord, Bissell & Brook, James H.M. Sprayregen, Rudnick & Wolfe, Chicago, Ill., for debtor-appellee.

Before WOOD, Jr., and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Kham & Nate's Shoes No. 2, Inc., ran four retail shoe stores in Chicago. It has been in bankruptcy since 1984, operating as a debtor in possession. First Bank of Whiting, one of Kham & Nate's creditors, appeals from the order confirming its plan of reorganization. This order not only reduces the Bank's secured claim to unsecured status but also allows Khamolaw Beard and Nathaniel Parker, the debtor's principals, to retain their equity interests despite the firm's inability to pay its creditors in full. The bankruptcy judge subordinated the Bank's claims after finding that it behaved "inequitably", and he allowed Beard and Parker to retain their interests on the theory that their guarantees of new loans to be made as part of the reorganization are "new value".

I

The Bank first extended credit to the Debtor in July 1981. This $50,000 loan was renewed in December 1981 and repaid in part in July 1982. The balance was rolled over until late 1983, when with interest it came to $42,000. In September 1983 Bank issued several letters of credit in favor of Debtor's customers. Debtor furnished a note to support these letters of credit; the Bank's security interest was limited to the goods the suppliers furnished. In late 1983 Debtor, experiencing serious cash-flow problems, asked for additional capital, which Bank agreed to provide if the loan could be made secure. That was hard to do, for Debtor had lost money the previous two years and owed more than $440,000 to tax collectors; any new loan from Bank would stand behind the back tax liabilities. The parties discussed two ways to make Bank secure: a guarantee by the Small Business Administration, and a bankruptcy petition followed by an order giving a post-petition loan super-priority.

While waiting for the SBA to act on its application, Debtor filed its petition under Chapter 11 of the Bankruptcy Code in January 1984. Judge Toles granted its application for an order under 11 U.S.C. § 364(c)(1) giving a loan from Bank priority even over the administrative expenses of the bankruptcy. Debtor and Bank then signed their loan agreement, which opens a $300,000 line of credit. The contract provides for cancellation on five days' notice and adds for good measure that "nothing provided herein shall constitute a waiver of the right of the Bank to terminate financing at any time".

The parties signed the contract on January 23, 1984, and Debtor quickly took about $75,000. Suppliers began to draw on the letters of credit. On February 29 Bank mailed Debtor a letter stating that it would make no additional advances after March 7. Although the note underlying the line of credit required payment on demand, Bank did not make the demand. It continued honoring draws on the letters of credit. Debtor's ultimate indebtedness to Bank was approximately $164,000: $42,000 outstanding on the loan made in 1981, $47,000 on the letters of credit, and $75,000 on the line of credit. Debtor paid $10,000 against the line of credit in April 1985 but has made no further payments. Debtor did not ask the court to order Bank to make further advances or to grant super-priority to another creditor to facilitate loans from another source.

There matters stood until the spring of 1988, when Debtor proposed its fourth plan of reorganization. Although the previous three plans had called for Bank to be paid in full, the fourth plan proposed to treat Bank's claims as general unsecured debts. This fourth plan also proposed to allow the shareholders to keep their stock, in exchange for guaranteeing new loans to Debtor.

Bankruptcy Judge Coar held an evidentiary hearing and concluded that Bank had behaved inequitably in terminating the line of credit and inducing Debtor's suppliers to draw on the letters of credit. These draws, the judge concluded, converted Bank from an unsecured lender (the position it held before the bankruptcy) to a super-secured lender under Judge Toles' financing order. Judge Coar first vacated the financing order and then subordinated Bank's debt, on the authority of 11 U.S.C. § 510(c). Finally, Judge Coar confirmed the plan of reorganization, including the provision allowing the stockholders of Debtor to retain their interests. He found that their guarantees were "new value" equivalent to the worth of the interests they would retain, which the judge thought small. The district judge affirmed, 104 B.R. 909 (N.D.Ill.1989).

## II

Appellate jurisdiction is our initial hurdle. Bank filed an appeal but now contends that we lack jurisdiction. It observes that although Judge Coar has confirmed the plan of reorganization, he has not quantified Bank's entitlements. Debtor filed a counterclaim against Bank, contending that it is entitled to more than $300,000 in damages because of Bank's refusal to provide extra credit. After Bank stopped making loans, Debtor closed its head office in a snazzy building on Michigan Avenue; a deterioration in the prestige of its address made suppliers less willing to deliver shoes on credit, Debtor insists, with the result that it shrunk from four stores (two in ritzy locations) to one on Chicago's south side. Judge Coar entered an order finding Bank liable to Debtor, essentially for the reasons he subordinated Bank's claims. After taking evidence on Debtor's damages in the spring of 1990, however, the judge issued an order requiring the parties to brief anew the question whether the finding of liability—and implicitly the subordination of Bank's claims—was proper. Pending counterclaims usually prevent a bankruptcy order from being final, see *In re Berke*, 837 F.2d 293 (7th Cir.1988), so Bank asks us to dismiss the appeal. (Why does Bank not just withdraw its notice of appeal? Appellate jurisdiction in bankruptcy cases is a murky subject. Bank fears that if the order confirming the plan turns out to be "final" after all, then it will forfeit its rights if it does not press all claims now. But see *In re Kilgus*, 811 F.2d 1112 (7th Cir.1987).)

Because of the counterclaim, questions closely related to those on appeal could return to the court. As a rule, the failure to liquidate a creditor's claim means no appellate jurisdiction. See *In re Morse Electric Co.*, 805 F.2d 262 (7th Cir.1986). An order confirming the plan of reorganization, however, marks the termination of any distinctive bankruptcy proceeding and is therefore appealable. *In re Xonics, Inc.*, 813 F.2d 127 (7th Cir.1987). The amount of the claim in *Xonics* was not in dispute, making it an easy case for finality

and hence appeal under 28 U.S.C. § 158(d). Still, because the debtor may proceed at once to carry out a confirmed plan, the existence of severable disputes does not prevent finality. A plan may be revoked only for fraud, and then only within six months. 11 U.S.C. § 1144. It is as close to *the* final order as any the bankruptcy judge enters.

Bank's claim against Debtor has been quantified. Because no one objected, Bank's claim was allowed in full automatically. 11 U.S.C. § 502(a). Nothing in the plan is contingent on the resolution of Debtor's counterclaim against Bank. As a practical matter, Debtor's request for damages against Bank is a separate piece of commercial litigation, demanding a remedy for breach of contract. Just as the final disposition of a controversy that would be a stand-alone dispute outside of bankruptcy is appealable, see *Morse* and *In re Jartran, Inc.*, 886 F.2d 859, 862 (7th Cir.1989), so the persistence of a separate adversary proceeding that would be a stand-alone dispute outside of bankruptcy does not prevent an appeal from an order confirming the plan of reorganization. We need not decide whether a decision to subordinate a claim would be appealable in advance of quantification; here the subordination was accomplished as part of the plan, and the confirmation order is always appealable.

## III

■ Subordination of Bank's claim required two steps: setting aside Judge Toles' financing order, followed by the application of § 510(c). Bank does not object to the first of these on the merits; it says only that Debtor tarried beyond the time allowed by Fed.R.Civ.P. 60(b) for modifying a judgment. This is a curious contention— not only because Rule 60(b) does not apply to bankruptcy cases save to the extent it has been incorporated into the bankruptcy rules, but also because it applies only to final decisions. *Kapco Mfg. Co. v. C & O Enterprises, Inc.*, 773 F.2d 151 (7th Cir. 1985). The financing order of 1984 was not a final judgment. Whether it may be vacated in 1988 is a question of the law of the

case, not of Rule 60(b). Judge Coar was entitled to revisit Judge Toles' orders. Delay did not prejudice Bank; nothing would be different had Debtor proposed subordination some years earlier in its initial plan of reorganization.

■ Setting aside the order is one thing; proceeding to equitable subordination under § 510(c) is quite another. There is an intermediate step, suggested by § 364(e), which provides that the reversal or modification of a financing order on appeal "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith". In other words, a lender that extends credit in reliance on a financing order is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous. Although § 364(e) speaks only of modification on appeal, it instantiates the principle that bankruptcy judges may make *binding* commitments to give priority to new credit. If creditors fear that the rug will be pulled out from under them, they will hesitate to lend. So § 364(e) and companion provisions, e.g., 11 U.S.C. § 363(m), former Bankruptcy R. 8–703(a)(6), disable courts from backtracking on promises in the absence of bad faith, which is a very narrow exception. *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 799 F.2d 317, 329–30 (7th Cir.1986); *In re EDC Holding Co.*, 676 F.2d 945 (7th Cir.1982); *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Magwood*, 785 F.2d 1077, 1081 n. 6 (D.C.Cir.1986).

■ A bankruptcy court's modification of its own orders poses the same risks as does reversal on appeal. Accordingly, although § 364(e) does not apply by its own terms, its principle applies through the law of the case. A judge lacks the power to undo the priority granted by a financing order without first finding that the creditor acted in bad faith. Yet it may be that Judge Coar omitted this finding because Bank did not insist on it. Even in this court, Bank ignores the principle behind § 364(e) and is content to argue that Debtor did not meet the criteria for subordina-

tion under § 510(c). We take commercial cases as the parties frame them, so we shall press on to the application of § 510(c) without implying that this is the proper way to proceed in future cases.

■ Judge Coar gave two principal reasons for subordinating Bank's claim. One is that the "Bank was fully aware of the Debtor's plight, and its reliance upon the line of credit, and disregarded the consequences for the Debtor and its creditors." The other is that Bank obtained an "unfair advantage" by inducing suppliers to draw on the letters of credit after the financing order, thus promoting its position on these advances from unsecured to supersecured. Bank has made our analysis of the second reason simple by disclaiming priority for either the $47,000 advanced to satisfy the letters of credit or the $42,000 outstanding on the loan made in 1981. These are, and always have been, unsecured loans. Orders under § 364(c) do not allow a creditor to boost the priority of existing loans. See *EDC Holding.* Section 364(c) speaks of "*obtaining* of credit or the *incurring* of debt" (emphasis added); prior loans and sums disbursed on prior firm commitments fit neither category. Sums paid out after bankruptcy on letters of credit issued before bankruptcy are pre-bankruptcy loans, to which § 364(c) cannot apply, because the bank is committed before the bankruptcy to honor sight drafts tendered with conforming draws. Priority under § 364 is not necessary to obtain this credit for the debtor. So although the financing order appears to give Bank priority on all of its loans, pre- and post-filing, Bank wisely concedes that the order could not properly have done so. The 1981 loan and the advances in 1984 to honor the letters of credit always were unsecured. The plan of reorganization properly treats them as unsecured.

■ Subordination matters only for the $65,000 outstanding on advances under the line of credit authorized by the financing order. Section 510(c) lets bankruptcy judges subordinate claims but does not provide criteria for the exercise of this power. Absence of statutory criteria commits the

subject to the courts, to be worked out in the common law fashion. *In re Virtual Network Services Corp.*, 902 F.2d 1246, 1248–49 (7th Cir.1990), Equitable subordination usually is a response to efforts by corporate insiders to convert their equity interests into secured debt in anticipation of bankruptcy. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re CTS Truss, Inc.,* 868 F.2d 146, 148–49 (5th Cir.1989) (collecting cases); *In re N & D Properties, Inc.,* 799 F.2d 726 (11th Cir. 1986); Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus.Law. 417, 429 (1985). Courts require the insiders to return to their position at the end of the line. *Virtual Network* extends principles of equitable subordination to a penalty created by operation of law, where delay in collecting the penalty injured other creditors. But Bank is neither an insider nor a person seeking to collect a penalty, and it has not delayed without justification. It contributed new value under a contract, and it wants no more than the priority Judge Toles promised as the lure.

Cases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between. *Benjamin v. Diamond,* 563 F.2d 692 (5th Cir. 1977) (*Mobile Steel Co.*), suggests that subordination depends on a combination of inequitable conduct, unfair advantage to the creditor, and injury to other creditors. Debtor submits that conduct may be "unfair" and "inequitable" for this purpose even though the creditor complies with all contractual requirements, but we are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do "more"—just how much more resting in the discretion of a bankruptcy judge assessing the situation years later. Contracts specify the duties of the parties to each other, and each may exercise the privileges it obtained. Banks sometimes bind themselves to make loans (commitment letters and letters of credit have this effect) and sometimes reserve the right to terminate further advances. Courts may not

convert one form of contract into the other after the fact, without raising the cost of credit or jeopardizing its availability. Unless pacts are enforced according to their terms, the institution of contract, with all the advantages private negotiation and agreement brings, is jeopardized. See *Travelers Insurance Co. v. Budget Rent–A–Car Systems, Inc.*, 901 F.2d 765 (9th Cir.1990); Alan Schwartz, *Justice and the Law of Contracts: A Case for the Traditional Approach*, 9 Harv.J.L. & Pub. Pol'y 107 (1986).

"Inequitable conduct" in commercial life means breach *plus* some advantage-taking, such as the star who agrees to act in a motion picture and then, after $20 million has been spent, sulks in his dressing room until the contract has been renegotiated. See, e.g., *United States v. Stump Home Specialties Mfg., Inc.*, 905 F.2d 1117, 1120–21 (7th Cir.1990); Varouj Aivazian, Michael Trebilcock & Michael Penny, *The Law of Contract Modifications: The Uncertain Quest for a Benchmark of Enforceability*, 22 Osgoode Hall L.J. 173 (1984); Timothy J. Muris, *Opportunistic Behavior and the Law of Contracts*, 65 Minnesota L.Rev. 521 (1981). Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith". Although courts often refer to the obligation of good faith that exists in every contractual relation, e.g., UCC § 1–201; *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987), this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith—such as the UCC's standard of honesty in fact, UCC § 1–201(19), and the reasonable expectations of the trade, UCC § 2–103(b) (a principle applicable, however, *only* to "merchants", which Bank is not)—

fill the gap. They do not block use of terms that actually appear in the contract.

We do not doubt the force of the proverb that the letter killeth, while the spirit giveth life. Literal implementation of unadorned language may destroy the essence of the venture. Few people pass out of childhood without learning fables about genies, whose wickedly literal interpretation of their "masters'" wishes always leads to calamity. Yet knowledge that literal enforcement means some mismatch between the parties' expectation and the outcome does not imply a general duty of "kindness" in performance, or of judicial oversight into whether a party had "good cause" to act as it did. Parties to a contract are not each others' fiduciaries; they are not bound to treat customers with the same consideration reserved for their families. Any attempt to add an overlay of "just cause"—as the bankruptcy judge effectively did—to the exercise of contractual privileges would reduce commercial certainty and breed costly litigation. The UCC's requirement of "honesty in fact" stops well short of the requirements the bankruptcy judge thought incident to contractual performance. "[I]n commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir.1933) (L. Hand, J.).

Bank did not break a promise at a time Debtor was especially vulnerable, then use the costs and delay of obtaining legal enforcement of the contract as levers to a better deal. Debtor and Bank signed a contract expressly allowing the Bank to cease making further advances. The $300,000 was the maximum loan, not a guarantee. The Bank exercised its contractual privilege after loaning Debtor $75,000; it made a clean break and did not demand improved terms. It had the right to do this for any reason satisfactory to itself. *In re Prima Co.*, 98 F.2d 952, 965 (7th Cir.1938); *CTS Truss*. See also UCC § 1–208 (official comment stating that the statutory obligation of good faith in accelerating a term

note does not apply to a bank's decision to call demand notes). The principle is identical to that governing a contract for employment at will: the employer may sack its employee for any reason except one forbidden by law, and it need not show "good cause".

Although Bank's decision left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first. To the extent *K.M.C., Inc. v. Irving Trust Co.*, 757 F.2d 752, 759–63 (6th Cir.1986), holds that a bank must loan more money or give more advance notice of termination than its contract requires, we respectfully disagree. First Bank of Whiting is not an eleemosynary institution. It need not throw good money after bad, even if other persons would catch the lucre. See *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 419 (7th Cir.1988); *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir.1989). See also Comment, *What's So Good About Good Faith? The Good Faith Performance Obligation in Commercial Lending*, 55 U.Chi.L.Rev. 1335 (1988).

Debtor stresses, and the bankruptcy judge found, that Bank would have been secure in making additional advances. Perhaps so, but the contract did not oblige Bank to make all advances for which it could be assured of payment. *Ex post* assessments of a lender's security are no basis on which to deny it the negotiated place in the queue. Risk must be assessed *ex ante* by lenders, rather than *ex post* by judges. If a loan seems secure at the time, lenders will put up the money; their own interests are served by making loans bound to be repaid. What is more, the bankruptcy judge's finding that Bank would have been secure in making additional advances is highly questionable. The judgment of the market vindicates Bank. If more credit would have enabled Debtor to flourish, then other lenders should have been willing to supply it. Yet no one else, not even the SBA, would advance additional money to Debtor.

Both the bankruptcy and district judges characterized as inequitable Bank's decision in December 1983 not to extend additional credit unless Kham & Nate's filed a petition in bankruptcy (or obtained a guarantee from the SBA). According to the courts, this forced the firm into bankruptcy; having propelled it there, Bank was obliged to help. This is insufficient on two levels—first because filing for bankruptcy often helps rather than injures the firm (the automatic stay keeps the wolves and tax collectors from the door), and second because linking an offer of extra credit to a bankruptcy petition does not "force" a firm to file one. A bank may insist on security before lending; bankruptcy followed by an order under § 364 was one device for providing it. If Kham & Nate's Shoes did not like that option, it was entitled to shop around. Conditioning new money on higher security no more obliges a Bank to "lend a helping hand" (in excess of contractual promises) than does setting a high rate of interest or taking security in receivables, other ways to deal with a lower probability of repayment.

Although Debtor contends, and the bankruptcy judge found, that Bank's termination of advances frustrated Debtor's efforts to secure credit from other sources, and so propelled it down hill, this is legally irrelevant so long as Bank kept its promises. It is factually questionable too. Why would Bank shoot itself in the foot—spurning what the bankruptcy judge thought to be sure repayment while leaving an outstanding balance of $164,000 that it could not expect to collect if Debtor collapsed? At all events, Debtor could have asked for further orders under § 364 making potential lenders secure and ensuring a flow of credit; it did not. It could have asked Judge Toles to clarify his financing order, so that other creditors would know that Bank's priority was limited to $75,000; it did not. A straightforward inference is that even high priority would not have induced other institutions to put up money—

just as high priority did not make Bank feel sufficiently secure.

█ The only breach on Bank's part that Debtor has identified is a technical one: the contract calls for five calendar days' telephonic and written notice, while Bank gave only written notice. (An officer of Bank testified that he gave telephonic notice, but the bankruptcy court's contrary finding is not clearly erroneous.) This offense was trivial. Clauses requiring notice by telephone are designed to ensure that the borrower has five *real* days to find a new lender, that delays in the mail do not diminish the time available. So Bank was obliged to extend credit until five days after Debtor received actual notice—that is, five days after the letter arrived. Bank mailed the letter February 29, 1984, terminating advances as of March 7. If the letter took two days to arrive, Debtor still had five days between notice and the cut-off. If Debtor got less, then an award would be in order for the loss attributable to the inadequate notice. It is safe to assume that the damages would be substantially less than the difference between the value of the $65,000 balance with super-priority and the amount that Bank will receive if the loan is lumped with other unsecured credit. Equitable subordination under § 510(c) is not a device to magnify the damages available for inconsequential breaches of contract.

## IV

A plan of reorganization may be confirmed only if each class of impaired creditors votes to accept it. There is one exception to the requirement of approval: 11 U.S.C. § 1129(b)(1), provides that a "fair and equitable" plan may be crammed down the throats of objecting creditors. The Code says that a plan treats unsecured creditors fairly and equitably if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). This is the "absolute priority rule". An objection to the plan may be overridden only if every class

lower in priority is wiped out. Priority is "absolute" in the sense that every cent of each class comes ahead of the first dollar of any junior class. See Walter J. Blum & Stanley A. Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations*, 41 U.Chi.L.Rev. 651 (1974).

Judge Coar approved a "cram-down" plan in this case. Unsecured creditors (including Bank) will not be paid in full. Bank objected to the plan, and the court overrode its objection after finding that the plan would be "fair and equitable". Yet the court did not extinguish the interests of every class junior to the unsecured creditors. Instead it allowed the stockholders to retain their interests, reasoning that by guaranteeing a $435,000 loan to be made as part of the plan, Beard and Parker contributed "new value" justifying the retention of their stock. The size of the new debt made the risk of the guarantees "substantial", the court found. The risk also exceeded the value of the retained stock, because "given the history of Debtor and the various risks associated with its business", the stock would have only "minimal" value. Beard and Parker thus would contribute more than they would receive, so the court allowed them to keep their stock.

There is something unreal about this calculation. If the stock is worth less than the guarantees, why are Beard and Parker doing it? If the value of the stock is "minimal", why does Bank object to letting Beard and Parker keep it? Is *everyone* acting inconsistently with self-interest, as the court's findings imply? And why, if the business is likely to fail, making the value of the stock "minimal", could the court confirm the plan of reorganization? Confirmation depends on a conclusion that the reorganized firm is likely to succeed, and not relapse into "liquidation, or the need for further financial reorganization". 11 U.S.C. § 1129(a)(11). If, as the bankruptcy court found, the plan complies with this requirement, then the equity interest in the firm *must* be worth something—as Beard, Parker, and Bank all appear to believe.

■ Stock is "property" for purposes of § 1129(b)(2)(B)(ii) even if the firm has a negative net worth, *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 208, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). An option to purchase stock also is "property". The bankruptcy judge gave Beard and Parker a no-cost option to buy stock, which they could exercise if they concluded that the shares were worth more than the risk created by the guarantees. Whether we characterize the stock or the option to buy it as the "property", the transaction seems to run afoul of § 1129(b)(2)(B)(ii) for it means that although a class of unsecured creditors is not paid in full, a junior class (the stockholders) keeps some "property".

■ Only the "new value exception" to the absolute priority rule could support this outcome. Dicta in cases predating the 1978 Code said that investors who put up new capital may retain interests equal to or lower in value than that new contribution. These interests are not so much "retained" as purchased for the new value (the "option" characterization of the transaction). Some firms depend for success on the entrepreneurial skills or special knowledge of managers who are also shareholders. If these persons' interests are wiped out, they may leave the firm and reduce its value. If they may contribute new value and retain an interest, this may tie them to the firm and so improve its prospects.

In principle, then, the exchange of stock for new value may make sense. When it does, the creditors should be willing to go along. Creditors effectively own bankrupt firms. They may find it worthwhile, as owners, to sell equity claims to the managers; they may even find it worthwhile to give the equity away in order to induce managers to stay on and work hard. Because the Code allows creditors to consent to a plan that impairs their interests, voluntary transactions of this kind are possible. Only collective action problems could frustrate beneficial arrangements. If there are many creditors, one may hold out, seeking to engross a greater share of the gains. But the Code deals with holdups by allowing half of a class by number (two-thirds

by value) to consent to a lower class's retention of an interest. 11 U.S.C. § 1126(c). Creditors not acting in good faith do not count toward the one-third required to block approval, § 1126(e). When there is value to be gained by allowing a lower class to kick in new value and keep its interest, the creditors should be willing to go along. *Ahlers,* 485 U.S. at 207, 108 S.Ct. at 968. A "new value exception" means a power in the *judge* to "sell" stock to the managers even when the creditors believe that this transaction will *not* augment the value of the firm. To understand whether the Code gives the judge this power (and, if it does, the limits of the power), it is necessary to examine the genesis of the doctrine.

The Bankruptcy Act of 1898 required plans of reorganization to be "fair-and equitable" but did not define that phrase. It also allowed creditors to consent to plans that impaired their interests, but the consent had to be unanimous. The absolute priority rule came into being as a cross between the interpretation of "fair and equitable" and a rule of contract law. *Northern Pacific Ry. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). Because contracts give creditors priority over shareholders, a plan of reorganization had to do the same. But under the 1898 Act bankruptcy also was a branch of equity, so it is not surprising that equitable modifications of the doctrine developed. One of these was the "new value exception" to the absolute priority doctrine. So far as the Supreme Court is concerned, however, the development has been 100% dicta.

*Kansas City Terminal Ry. v. Central Union Trust Co.,* 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926), is the genesis of the exception. The Court conceived the absolute priority rule as barring any retention of interest by a shareholder if any layer of creditors is excluded. It used this rule to veto a decision by the secured creditor to allow the shareholder a stake when junior creditors were cut out and objected. Yet the senior creditor, which as a practical matter owned 100% of the firm, must have had a reason to suffer the continued existence of the shareholder. The plan in *Kan-*

*sas City Ry.* was identical in principle to selling the firm to the secured creditor at auction, and the secured creditor giving some stock to the manager and former shareholder. Only the fact that both steps were rolled into one plan of reorganization gave the junior creditor an opportunity to say no (as a practical matter to hold out for some portion of the gains). The Court said in dicta that this right to object did not give the junior creditor as potent a power as it might, because the judge could modify the strict priority equitably if the shareholder agreed to contribute new value.

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), came next. The bankruptcy judge took the hint in *Kansas City Ry.* and allowed shareholders to retain an interest in exchange for their promise to contribute value in the form of continuity of management, plus financial standing and influence in the community that would enable the debtor to raise new money. It allowed the shareholders to retain their interests even though the class of senior creditors objected (because unanimity could not be achieved)—a dramatic step from the suggestion in *Kansas City Ry.* that new value plus the *consent* of the creditor whose claim exceeded the value of the firm would suffice. The Supreme Court reversed, holding that new value must mean "money or money's worth", 308 U.S. at 121–22, 60 S.Ct. at 10–11. It did not remark on the difference between consent and objection from the creditors, and it did not really need to given its conclusion that non-monetary value is insufficient.

Cases in the lower courts proceeded to apply the dicta in *Case* and *Kansas City Ry.* without noticing the difference between consent and objection by the creditors. But see *SEC v. Canandaigua Enterprises Corp.*, 339 F.2d 14, 21 (2d Cir. 1964) (Friendly, J.), questioning the doctrine on this basis; Henry J. Friendly, *Some Comments on the Corporate Reorganization Act*, 48 Harv.L.Rev. 39, 77–78 (1934). Perhaps this distinction was not an essential one in the administration of a common law doctrine, especially not when (a) the unanimity rule made the lack of consent the norm, and (b) bankruptcy was a branch of equity.

Everything changed with the adoption of the Code in 1978. The definition of "fair and equitable" is no longer a matter of common law; § 1129(b)(2) defines it expressly. Holdouts that spoiled reorganizations and created much of the motive for having judges "sell" stock to the manager-shareholders no longer are of much concern, now that § 1126(c) allows the majority of each class (two-thirds by value) to give consent. And bankruptcy judges no longer have equitable powers to modify contracts to achieve "fair" distributions. Bankruptcy judges enforce entitlements created under state law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1197–98 (7th Cir.1989); *In re Iowa R.R.*, 840 F.2d 535 (7th Cir.1988). "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Ahlers*, 485 U.S. at 206, 108 S.Ct. at 968.

Whether the "new value exception" to the absolute priority rule survived the codification of that rule in 1978 is a question open in this circuit. *In re Stegall*, 865 F.2d 140, 142 (7th Cir.1989). The language of the Code strongly suggests that it did not, and we are to take this language seriously even when it alters pre-Code practices. *Pennsylvania Department of Welfare v. Davenport*, —— U.S. ——, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1030–33, 103 L.Ed.2d 290 (1989); *Levit*, 874 F.2d at 1196–97. See also Douglas G. Baird & Thomas H. Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule*, 55 U.Chi.L.Rev. 738, 746–47 & n. 23, 756–60 (1988). The legislative history reinforces the implication of the text. The Bankruptcy Commission proposed a modification of the absolute priority rule, and its proposal was not warmly received. See, e.g., Victor Brudney, *Bankruptcy Commission's Proposed "Modifications" of the Absolute Priority Rule*, 48

Am.Bankr.L.J. 305 (1974). Congress moved in the other direction, enacting the rule in an uncompromising form: "The general principle of the subsection permits confirmation notwithstanding non-acceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 413 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6369. Neither the report nor any part of the text of the Code suggests a single exception to this blanket rule.

Bank asks us to hold that the new value exception vanished in 1978. We stop short of the precipice, as the Supreme Court did in *Ahlers*, 485 U.S. at 203–04 n. 3, 108 S.Ct. at 967–68 n. 3, for two reasons: first, the consideration for the shares is insufficient even if the new value exception retains vitality; second, although Bank vigorously argues the merits of the new value exception in this court, it did not make this argument in the bankruptcy court. Despite Bank's failure to preserve its argument, the history and limits of the rule before 1978 are pertinent to our analysis because, as the Court held in *Ahlers*, 485 U.S. at 205–06, 108 S.Ct. at 968–69, at a minimum the Code forbids any expansion of the exception beyond the limits recognized in *Case*.

*Case* rejected the argument that continuity of management plus financial standing that would attract new investment is "new value". According to the Court, only an infusion of capital in "money or money's worth" suffices. *Ahlers* reinforces the message, holding that a promise of future labor, coupled with the managers' experience and expertise, also is not new value. It remarked that the promises of the managers in *Case* "[n]o doubt ... had 'value' and would have been of some benefit to any reorganized enterprise. But ultimately, as the Court said ..., '[t]hey reflect merely vague hopes or possibilities.' The same is true of respondents' pledge of future labor and management skills." 485 U.S. at 204, 108 S.Ct. at 967 (citations omit-

ted). The Court observed, *ibid.*, again quoting from *Case*, that the promise was "intangible, inalienable, and, in all likelihood, unenforceable. It 'has no place in the asset column of the balance sheet of the new [entity].' "

Guarantees are no different. They are intangible, inalienable, and unenforceable by the firm. Beard and Parker may revoke their guarantees or render them valueless by disposing of their assets; although a lender may be able to protest the revocation, the debtor cannot compel the guarantor to maintain the pledge in force. Guarantees have "no place in the asset column" of a balance sheet. We do not know whether these guarantees have the slightest value, for the record does not reveal whether Parker and Beard have substantial unencumbered assets that the guarantees would put at risk. If Beard and Parker were organizing a new firm in Illinois, they could not issue stock to themselves in exchange for guarantees of loans. Illinois requires the consideration for shares to be money or other property, or "labor or services actually performed for the corporation", Ill.Rev.Stat. ch. 32 ¶ 6.30. So Beard and Parker could subscribe for shares against a promise of labor, but the firm could not issue the shares until the labor had been performed. A guarantee does not fit into any of the statutory categories, and there is no reason why it should. One who pays out on a guarantee becomes the firm's creditor, a priority higher than that of stockholder. A guarantor who has *not* paid has no claim against the firm. Promises inadequate to support the issuance of shares under state law are also inadequate to support the issuance of shares by a bankruptcy judge over the protest of the creditors, the real owners of the firm.

Debtor relies on *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986), but it does not support the bankruptcy judge's decision. The new value in *Potter* was a combination of $34,800 cash plus a guarantee of a $600,000 loan. If Beard and Parker had contributed substantial cash, we would have a case like *Potter*. They didn't, and we don't. To the extent

*Potter* implies that a guarantee alone is "new value", it did not survive *Ahlers*. *Potter* observed that the guarantor took an economic risk, 781 F.2d at 103. *Ahlers* holds that *detriment* to the shareholder does not amount to "value" to the firm; there must be an infusion of new capital. See John D. Ayer, *Rethinking Absolute Priority after* Ahlers, 87 Mich.L.Rev. 963 (1989). A guarantee may be costly to the guarantor, but it is not a balance-sheet asset, and it therefore may not be treated as new value. The plan of reorganization should not have been confirmed over Bank's objection.

VACATED AND REMANDED.