In re **WESTERN PACIFIC AIRLINES, INC.,** Debtor.

**SMITH MANAGEMENT COMPANY,** Energy Management Corp. and Sundance Venture Partners L.P., II, Appellants,

v.

**CITY AND COUNTY OF DENVER** and Max Acquisition Co., LLC, Appellees.

No. CIV. A. 98–K–1480.

Bankruptcy No. 97–24701 SBB.

United States District Court, D. Colorado.

Sept. 11, 1998.

**800**

David T. Brennan, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, CO, Stephen J. Shimshak, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Appellants.

Christian C. Onsager, Michael J. Pankow, Faegre & Benson, Denver, CO, Jeffrey A. Weinman, Weinman, Cohen & Niebrugge, P.C., Denver, CO, James T. Markus, Block, Markus and Williams, LLC, Denver, CO, Leo M. Weiss, United States Trustee's Office, Denver, CO, Douglas W. Jessop, Holden & Jessop, P.C., Denver, CO, Caroline C. Fuller, Fairfield & Woods, P.C., Denver, CO, Brian Sirower, John Joseph Dawson, Streich Lang, P.C., Phoenix, AZ, for Appellees.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior Judge.

This is the latest in a series of appeals arising out of the Western Pacific Airlines, Inc. ("WestPac") bankruptcy litigation. In this appeal, Smith Management Company ("Smith") and Energy Management Corporation and Sundance Venture Partners. L.P., II (collectively, the "DIP Lenders") challenge two orders of the bankruptcy court dated June 23 and June 29, 1998 (the "Orders"), allowing WestPac to deposit certain proceeds of its asset sales [1] into a "Creditors' Trust Account" rather than into the DIP Lenders' "Collateral Account." The Orders also authorized the disbursement of a small portion of those proceeds to the City and County of Denver ("Denver") and other municipal entities for sales and related taxes, and further authorized the proposed sale of additional assets of the estate. The DIP Lenders contend these Orders are erroneous because they, as superpriority lienholders, are entitled to all proceeds of all sales of WestPac assets pursuant to 11 U.S.C. § 364(e).

The appellees in this case are Denver and MAX Acquisition Co., L.L.C. ("MAX Acquisition"),[2] an Arizona limited liability company that itself advanced more than $1.8 million of debtor-in-possession financing to low-cost regional air carrier and affiliate of WestPac

---

1. WestPac has been liquidating assets since February 1998 and, on July 6, 1998, the Chapter 11 reorganization was formally converted to Chapter 7.

2. Original appellee Former Official Unsecured Creditors' Committee of WestPac is no longer an active party and has been removed from the caption pursuant to this court's order issued during the July 29, 1998 scheduling conference. *See* Courtroom Minutes (July 29, 1998).

Mountain Air Express, Inc. ("MAX"). West-Pac helped form MAX in 1996 and, at the time WestPac filed for bankruptcy protection in October 1997, owned an approximate 57% interest in the carrier.

MAX Acquisition asserts MAX was forced to curtail service and, eventually, to declare bankruptcy in part because of Smith's and WestPac's actionable misconduct during the course of WestPac's reorganization efforts. In Adversary Proceeding No. 98–1348–RJB (pending before Judge Brumbaugh) MAX Acquisition claims over $1 million in ticket sale and flight proceeds held by WestPac is property of MAX under its prepetition contract with WestPac and not assets of the WestPac estate. MAX Acquisition claims WestPac wrongfully held those proceeds for the benefit of Smith and that Smith and WestPac acted deliberately to withhold those proceeds and to damage MAX's business and goodwill. MAX Acquisition asserts claims against Smith and WestPac ranging from breach of contract and unjust enrichment to conversion and equitable estoppel. MAX Acquisition seeks various remedies, including the imposition of a constructive and resulting trust against both.

Because MAX claims an interest in West-Pac's asset sales proceeds superior to that of the DIP Lenders and therefore holds a direct interest in the Creditors' Trust Account at issue in this appeal, I granted MAX Acquisition's motion for leave to intervene on July 28, 1998. In its response brief, in which Denver joins, MAX Acquisition identifies at least nine other actions pending before Judge Brooks or Judge Brumbaugh in which various entities claim rights to assets and proceeds of sales of assets superior to the rights of Smith. MAX contends Judge Brooks's June 23 and 26 rulings were nothing more than stay orders intended to preserve the status quo in recognition of these competing claims. They did not upset liens or reorder any creditor's interest or priority. Instead, MAX argues, the Orders were appropriate exercises of the bankruptcy court's equitable authority under 11 U.S.C. § 105 given the greater context of the related bankruptcy proceedings and the pending claims of

wrongdoing against Smith and WestPac. I agree.

## Discussion.

The background of this bankruptcy case is, by now, familiar. Western Pacific, a Denver-based airline, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 5, 1997. Its cash nearly depleted, WestPac needed extensive debtor-in-possession financing. In early December 1997, the DIP Lenders agreed to provide up to $30 million in such financing to the airline.

As described in this court's March 10 opinion in a related appeal, the DIP Lenders agreed to make the high-risk loan only if provided an array of special Bankruptcy Code protections, including a superpriority administrative expense claim with priority over virtually all expenses of administering the estate (including Chapter 7 administration expenses, if the case were converted) pursuant to 11 U.S.C. § 364(c)(1), a first priority lien on all unencumbered assets and a junior lien on all encumbered assets pursuant to § 364(d)(1). After a lengthy hearing on December 3, 1997, the bankruptcy court specifically found the parties to have been proceeding in good faith and approved the financing arrangement under the conditions demanded. In its December 3 Order, as formalized and amended by its December 10 Order Authorizing Debtor to Obtain Postpetition Financing Pursuant to Sections 364(c)(1) and 364(d) of the Bankruptcy Act, the bankruptcy court authorized WestPac to obtain a loan from the DIP Lenders in accordance with the terms and conditions of the parties' negotiated Credit Agreement and Security and Pledge Agreement.

WestPac's reorganization was unsuccessful. On February 4, 1998, the airline's board of directors voted to cease operations and WestPac began to liquidate its property. WestPac and the DIP Lenders renegotiated certain aspects of their Credit and Security Agreements and, on March 5, 1998, the bankruptcy court entered an order adopting the changes. *See* Order Authorizing Western Pacific to Amend Credit Agreement and Security Agreement (R. Vol. I, Tab 1045). Specifically, the Order adopted the parties'

Amendment No. 1 to the Credit Agreement, which added the following language to Section 8.11 concerning proceeds of asset sales:

> *Proceeds.* In addition to any other rights and remedies afforded to the Lenders hereunder ... the Borrower shall, unless otherwise agreed to by the Lenders, immediately upon receipt deposit from time to time into the Collateral Account (as defined in the Security Agreement) *all cash and cash equivalents, whether or not constituting proceeds of the Collateral, received by the Borrower from any source,* and the Lenders shall, in their sole discretion, either (a) apply such amounts to reduce the Loans then outstanding or (b) release to the Borrower such amounts as may be necessary to enable the Borrower to pay the fees and expenses described in the last sentence of Section 9.9 hereof....

*See* Amendment No. 1 to Credit Agreement (attached to March 5, 1998 Order) at ¶ 2(b) (R. Vol. I at Tab 1045). The March 5 Order was never appealed.

On April 20, 1998, WestPac filed a motion asking the bankruptcy court to authorize the disbursement of proceeds obtained from the sale of certain assets to Cheap Tickets, Inc. (the "Disbursement Motion"). The Motion sought to distribute approximately $9,400 to the City and County of Denver, El Paso County and the State of Colorado for personal property and sales taxes, and the remaining proceeds ($38,466.35) to the DIP Lenders. On April 21, 1998, WestPac filed another motion seeking authorization from the bankruptcy court pursuant to 11 U.S.C. §§ 363(b) and (f) to sell other assets of the estate free and clear of all liens and encumbrances (the "Sale Motion"). The bankruptcy court held a hearing on the two motions on June 17, 1998.

At the hearing, WestPac withdrew the Disbursement Motion to the extent it requested authorization for disbursement to the DIP Lenders. WestPac stated the $38,466.35, together with the proceeds from any sales the court authorized pursuant to the Sale Motion, would be deposited in an account pursuant to an Order of the bankruptcy court issued June 15, 1998, which required WestPac to establish a reserve for the fees of The Boeing Company.[3] WestPac further stated its intention to interplead those funds in an adversary proceeding to determine the validity and priority of the conflicting claims asserted by the DIP Lenders and Boeing.

In its order dated June 23, 1998, the bankruptcy court granted the Sale Motion and determined distribution to Denver, El Paso County and the State of Colorado as set forth in the Disbursement Motion was appropriate. With respect to WestPac's proposal to place the remaining proceeds in the Boeing reserve account, the bankruptcy court agreed "other parties may claim an interest in or prior right to said funds" but expressed concern that an interpleader action would "not necessarily protect the potential rights of all such parties." To address that concern and "maintain the status quo pending resolution of the DIP Lenders' Motion to withdraw the reference,"[4] Judge Brooks opted to exercise its general equitable authority under 11 U.S.C. § 105(a) and ordered WestPac to deposit the remainder of the proceeds from the Cheap Tickets sale, together with the proceeds from the authorized sales (less sales taxes), into a "segregated 'Creditors' Trust Account' to be held pending further order of this Court." *See* June 23 Order at 2–3. It is this aspect of the bankruptcy court's order, and its June 26 reaffirmance of that Order on reconsideration, that is the subject of this appeal.

---

**3.** The Boeing Company filed a motion for allowance and order compelling immediate payment of professional fees in April 1998, which the bankruptcy court granted on June 15, 1998. In its June 15 Order (R. Vol. I, Tab 1462), the bankruptcy court directed funds reflecting fees not properly set aside for Boeing's benefit be placed in reserve.

**4.** I summarily denied the withdrawal motion on June 24, 1998. *See* Minute Order, No. 98–K–1364 (Smith's request for removal to district court of twelve related adversary proceedings unwarranted notwithstanding practice of random assignment of such actions to various bankruptcy judges; "nothing stand[s] in the way of the DIP Lenders moving for an appropriate order in the bankruptcy court consolidating all related matters before one bankruptcy judge").

■ Given the nature and complexity of the bankruptcy proceedings and the early stages of those actions in which entities like MAX Acquisition assert competing claims to WestPac's assets and asset sale proceeds, I find the DIP Lenders' appeal premature. The June 23 and 26 Orders do nothing more than stay disbursement of proceeds pending further consideration of colorable and competing claims to ownership of WestPac assets. The Orders do not revoke the December 10 or March 5 financing orders nor do they alter or extinguish the DIP Lenders' existing priorities or liens. Bankruptcy courts enjoy substantial discretion in the administration of estates and should be allowed to issue an actual decision or ruling before being taken up on appeal.

The DIP Lenders assert the June Orders revoked protections extended to them in the December 10 and March 5 financing orders in violation of 11 U.S.C. § 364(e). They rely heavily on the Seventh Circuit's decision in *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (1990), where the Seventh Circuit reversed a confirmation order of the bankruptcy court which subordinated, under 11 U.S.C. § 510(c), appellant-lenders' superpriority claim. The appeals court determined the facts on the record could not support a finding of "bad faith" necessary to equitable subordination under § 510(c), and concluded the plan should not have been confirmed over the lenders' objection. 908 F.2d at 1355–63.

While the reversal in *Kham* was premised on a § 510(c) analysis, the Seventh Circuit emphasized that it engaged in that analysis only because the parties had framed the issues on appeal that way. According to the court, the bankruptcy judge had overlooked § 364(e) in proceeding directly to the equitable subordination claim. Section 364(e), while technically applicable only to modifications of postpetition financing orders on appeal, "instantiates the principle that bankruptcy judges may make *binding* commitments to give priority to new credit." 908 F.2d at 1355 (emphasis original). It "disabl[es] them from backtracking on promises in the absence of bad faith, which is a very narrow exception."

*Id.* Although § 364(e) did not by its express terms apply to the confirmation order, the circuit court reasoned it did apply through the law of the case doctrine and rendered the bankruptcy court without "power to undo the priority granted by a financing order without first finding that the creditor acted in bad faith." *Id.*

This analysis, although only dicta in *Kham*, is clearly consistent with the analysis applied by this court over the course of the WestPac bankruptcy proceedings. The DIP Lenders are entitled as a matter of law to rely on the terms of the bankruptcy court's financing orders unless they are shown to have acted in bad faith. This principle does not, however, mandate the conclusion urged by the DIP Lenders in this appeal.

I decline to extend *Kham* or my previous § 364(e) analyses to invalidate orders of the bankruptcy court which clearly were issued pursuant to the court's authority under § 105 to administer an estate efficiently and equitably and which neither compromise the DIP Lenders' priority nor their rights to the proceeds of assets conclusively "their" collateral under the amended Credit Agreement. As I understand the June Orders, they stay disbursement of funds that may *or may not* be proceeds of assets owned by the estate and, therefore, may or may not be proceeds of "Collateral" subject to immediate disbursement under Amendment No. 1. Further, given the pendency of claims asserting bad faith on the part of WestPac and the DIP Lenders during the critical January–February 1998 time period preceding the March 5 Order approving Amendment No. 1, the Orders also stay the disbursement of funds that may, upon a proper showing, be subject to equitable subordination.

The June Orders neither compromise the DIP Lenders' priority nor expunge any established rights of the DIP Lenders under the December 10 and March 5 financing orders. At this stage of the proceedings, I cannot conclude that the June Orders run afoul of § 364(e) or the law of this case, or that their issuance, given the complexities of the WestPac liquidation and uncertainties as to ownership of the specific assets in question, was an abuse of discretion. The bank-

ruptcy court's Orders dated June 23 and June 26, 1998, are therefore AFFIRMED.