**In re TRIPLE R HOLDINGS, L.P., Debtor.**

**Bankruptcy No. 91-5-4118-MM.**
**R.S. No. 911027.**

United States Bankruptcy Court,
N.D. California.

Dec. 10, 1991.

---

OPINION

MARILYN MORGAN, Bankruptcy Judge.

## I. Introduction

Before the court is the motion of First Republic Thrift & Loan of San Diego, a secured creditor, seeking relief from the automatic stay to foreclose on the debtor's principal asset, a condominium unit in San Francisco, California. First Republic is undersecured and asserts that any plan proposed by the debtor, Triple R Holdings, L.P., would violate the absolute priority rule. The court has considered the argument, and concluded that the new value exception to the absolute priority rule remains viable, and that it is possible for the debtor to confirm a plan within a reasonable time.

## II. Facts

On October 4, 1990, First Republic loaned $510,000 to Benjamin M. Bitanga for the purpose of refinancing real property consisting of a single condominium unit and accompanying storage area located at 1001 California Street. The loan was evidenced by a nonrecourse promissory note and secured by a deed of trust. On November 7, 1990, Mr. Bitanga transferred title to the property to Robert R. Romer without the knowledge or consent of First Republic.[1]

The property was subsequently conveyed by Mr. Romer to the debtor, a California limited partnership; the debtor's general partner is a corporation wholly owned by Mr. and Mrs. Romer, who are sophisticated real estate investors. Mr. and Mrs. Romer also own and reside in the penthouse unit at 1001 California Street. The debtor began making payments to First Republic in order to preserve its interest in the property, and filed an application with First Republic to assume Mr. Bitanga's loan.

At the time of their transactions with Mr. Bitanga, First Republic and Mr. Romer

Seymour J. Abrahams, San Jose, Cal., for debtor.

Robert M. Lichtman, San Francisco, Cal., for secured creditor and moving party.

---

1. This was not a normal sale. The transfer of the real property was intended to secure loans totalling $120,000 from Mr. Romer to his neighbor, Mr. Bitanga. Mr. Romer orally promised to reconvey the property to Mr. Bitanga upon repayment of the loan. The transaction was structured in this manner because Mr. Bitanga is not a United States citizen and is frequently outside the country. Mr. Bitanga has *not* repaid Mr. Romer.

believed that Doris Symons, a tenant occupying Mr. Bitanga's unit, held a month to month tenancy. Because she was an elderly person at the time of the condominium conversion, however, Ms. Symons has, in effect, a life estate in the unit by operation of San Francisco's condominium conversion and rent control ordinances; the ordinances limit her rent to the amount payable at the time of the condominium conversion, subject to certain allowed adjustments. She has a remaining life expectancy of approximately seven and one half years.

Ms. Symons' life estate has depressed the value of the condominium unit. Her current monthly rent of approximately $1,920 is less than the monthly condominium dues of $1,950 and pays nothing toward debt service on the property. First Republic initially asserted that the property was worth $625,000, but now claims that the property should be valued at approximately $344,000. The debtor contends that the value may have to be discounted even further.

When Mr. Romer learned of Ms. Symons' life estate, he withdrew the application to assume First Republic's loan to Mr. Bitanga. He also stopped making payments to First Republic. First Republic then began foreclosure proceedings which prompted the filing of the debtor's Chapter 11 petition.

At the commencement of the case on July 8, 1991, the amount owed to First Republic was approximately $540,000. The motion for relief from the automatic stay was filed on August 7, 1991. In opposition to the motion, the debtor outlined a plan which would permit it to retain the real property.

Under the debtor's tentative plan, First Republic would receive the value of its secured claim on the effective date of the plan. There would be no payment on First Republic's unsecured claim. The debtor's only other unsecured claim, dues of approximately $42,000 owed to the homeowners' association, would be separately classified. The plan proposes to pay that claim in full, and the debtor asserts that it is necessary to do so in order to avoid further assessments by the homeowners' association. Mr. Romer has sufficient cash which he will contribute to the debtor to make these payments.

Alternatively, the tentative plan provides that if First Republic elects to have its whole claim treated as secured under § 1111(b), it would receive a payment of $100,000 on the effective date of the plan, and monthly payments thereafter of $2,010 for a period of eighteen years and three months. These monthly payments total $440,000.' In this scenario, First Republic would receive the allowed amount of its claim, $540,000.

Although the debtor's tentative plan provides for payment in the full amount of First Republic's claim if it elects to have its claim treated as fully secured pursuant to § 1111(b), First Republic asserts it will split its claim and use the vote for its unsecured claim to veto the debtor's plan. First Republic takes this position even though the property will be essentially unmarketable for a period of years as a result of the life tenancy.

III. Issue

The court must grant relief from the automatic stay unless there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). First Republic asserts that the debtor's tentative plan is not confirmable because it violates the absolute priority rule. The debtor claims that its tentative plan falls within the new value exception to the absolute priority rule. The court must consider whether the new value exception remains an open path to reorganization in determining whether to grant relief from the automatic stay.

IV. Discussion

A. *The Initial Judicial Response to Ahlers*

1. The Quandary Raised by *Ahlers*

Under Chapter X of the Bankruptcy Act of 1898, as amended ("the Act"), the abso-

lute priority rule [2] and the new value exception [3] were subsumed within the term "fair and equitable." *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 115–17, 60 S.Ct. 1, 6–8, 84 L.Ed. 110 (1939). Congress made substantial revisions to the bankruptcy laws when it enacted the Bankruptcy Reform Act of 1978 ("the Code").[4] Whether the new value exception continues to exist was brought into question by the Supreme Court's opinion in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988). The Supreme Court in *Ahlers* expressly declined to resolve the issue, stating that "its decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* exception...." *Id.*

### 2. In re Kham & Nate's Shoes No. 2 v. First Bank of Whiting

The Seventh Circuit considered the question posed by *Ahlers* in a case involving a closely held corporation engaged in retail sales. *See In re Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990). The court acknowledged that its discussion of the new value exception was *dicta* and addressed issues not raised in the bankruptcy court. *Id.* at 1362.

However, that court indicated the definition of "fair and equitable" is "no longer a matter of common law." The bankruptcy courts' equitable powers must be "exercised within the confines of the Bankruptcy Code." *Id.* at 1361 (citing *Ahlers*). The Seventh Circuit then suggested, but stopped short of ruling, that the new value exception did not survive codification of the absolute priority rule in § 1129(b)(2).[5]

### 3. In re Outlook/Century Ltd.

Recently, one bankruptcy court in this district held that the new value exception did not survive enactment of the Code. *See In re Outlook/Century Ltd.*, 127 B.R. 650 (Bankr.N.D.Cal.1991). In *Outlook/Century*, the court stated that "the starting point for interpreting a statute is the language of the statute itself." *Id.* at 656 (citations omitted). It reasoned that "in enacting section 1129(b) [of the Code], Congress replaced the *judicially* created definition of 'fair and equitable' with a *congressionally* created definition of that standard." *Id.* at 657 (emphasis in original). Because the plain language of § 1129(b) does not contain a new value exception, the court concluded that it does not exist. *Id.* at 656.

The court further reasoned that the statutory context of the term "fair and equitable" makes the continued vitality of the

**2.** The absolute priority rule is described as:
> Beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate. Thus the principle is applied as between senior and junior secured creditors, between secured creditors and unsecured creditors, between unsecured creditors and stockholders, between different classes of stockholders, and, of course, between secured creditors as a whole and stockholders.

5 Collier on Bankruptcy ¶ 1125.02 at 1125–8.1 (15th ed. 1991) ("Collier").

**3.** Justice William O. Douglas defined the new value exception as:
> ... where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution[,] * * * * ... the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all

the circumstances to the participation of the stockholder.

*Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 112, 60 S.Ct. 1, 5, 84 L.Ed. 110 (1939).

**4.** Codified at 11 U.S.C. §§ 101 *et seq.* All future references to statutory provisions relate to Title 11 of the United States Code.

**5.** 11 U.S.C. § 1129(b)(2) provides:
> For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (B) With respect to a class of unsecured claims—
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

new value exception unnecessary. *Id.* at 657. Since § 1129(a) altered prior law by authorizing courts to confirm a plan to which all classes of creditors consent, regardless of whether it is fair and equitable, the new value exception is no longer needed as a means of confirming a plan. *Id.*

This court does not agree with two aspects of the analysis in *Outlook/Century.* First, the plain language of § 1129(b) does not exclude the new value exception. Rather, § 1129(b) is silent with respect to the new value exception. In the absence of specific statutory guidance, a court should consider the pre-Code practice and legislative history. *Begier v. Internal Revenue Service,* 496 U.S. 53, 110 S.Ct. 2258, 2265–67, 110 L.Ed.2d 46 (1990).

Second, statutory analysis should not be limited to § 1129, as statutory construction is a "holistic endeavor." *Timbers,* 484 U.S. at 371, 108 S.Ct. at 629–630. Although the *Outlook/Century* court's interpretation of § 1129 may appear reasonable when viewed in isolation, consideration of the remainder of the statutory scheme is important "because only one of the permissible meanings [may] produce[] a substantive effect that is compatible with the rest of the law." *Id.* This fundamental disagreement regarding statutory construction leads this court to the opposite conclusion: the new value exception continues to exist under the Code.

4. In re Greystone III Joint Venture

An even more recent opinion also concluded that there was no new value exception under the Code. *See In re Greystone III Joint Venture,* 948 F.2d 134 (5th Cir. 1991). In *Greystone,* the debtor's only significant asset was an office building valued at $5,825,000. The building was encumbered by a nonrecourse note secured by a deed of trust in the amount of $9,325,000. The debtor's plan provided payment of less than four cents on the dollar for the secured creditor's $3,500,000 deficiency claim and trade debt of approximately $10,000;

the deficiency claim and trade debt were separately classified.

The secured lender, Phoenix Mutual Life Insurance Corporation, elected to split its claim and then voted to reject the debtor's plan. Phoenix Mutual testified to its willingness to fund its own plan, which would provide full payment on all unsecured claims. The bankruptcy court refused to consider this proposal when it confirmed the debtor's plan. The district court affirmed the bankruptcy court.

The Fifth Circuit reversed, however, on the grounds that it was not proper for the debtor to classify Phoenix Mutual's deficiency claim separately from the trade debt; the improper classification would eliminate Phoenix Mutual's voting rights as an unsecured claimant; the new value exception did not survive enactment of the Code; and, even if it did, its standards are too difficult to apply. Underlying the circuit court's holding is the pervasive assumption that Chapter 11 embodies the principle of creditor control.

This court concurs with the result reached by the Fifth Circuit on the facts of *Greystone,* but not the reasoning articulated in the decision. The debtor's plan in that case should not have been confirmed and the secured creditor should have been allowed to present a competing plan.

In many cases, the debtor's offer to general unsecured creditors is better than that offered by the undersecured creditor. The Fifth Circuit's rationale in *Greystone* would eliminate negotiation between the parties and grant the undersecured creditor a blocking ballot by virtue of its deficiency claim.[6] This veto power would enable an undersecured creditor to remove an important asset from the estate and eliminate the possibility of recovery by general unsecured creditors and equity interests. This result goes beyond general principles of creditor control to preferred treatment.

6. Under § 506(a), an allowed claim of a secured creditor is "a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." Thus, in the case of a nonrecourse creditor, the Code creates an unsecured deficiency claim against the estate.

The Fifth Circuit's rationale is particularly troubling because the undersecured creditor often casts its votes for both its secured claim and deficiency claim in accordance with its interest as a *secured* creditor. Thus, under the Fifth Circuit's analysis, general unsecured creditors as well as equity holders lose any chance of recovery. The better interpretation is to allow the general unsecured creditors to negotiate with both the secured creditor and the debtor in order to achieve the most favorable plan.

B. *Congress Did Not Create A Veto Power For The Undersecured Creditor*

1. The Debate Over Treatment Of Single Asset Real Estate Cases

Under Chapter XII of the Act, single asset real estate debtors could "write down" secured debt while the market was low over the objection of secured creditors, retain the property, and later enjoy the appreciation realized in excess of the reduced mortgage if the market rebounded.[7] The Congressional debate over treatment of single asset real estate cases was sparked by a number of cases which utilized the cram down powers.[8] The resulting legislative drafts contain polar differences.

The House bill, H.R. 8200, favored rehabilitation of the debtor, and would have done little to change a debtor's ability to write down mortgages under Chapter XII.

H.R. 8200, as approved by the House of Representatives, permitted the proponent of a plan of reorganization to use the "cram down" provisions contained in section 1129(b) of H.R. 8200 against a dissident secured creditor in any reorganization case. If the secured creditor held a nonrecourse claim, such creditor was entitled to receive payments over time of the court determined value of the collateral, but was not entitled to assert a deficiency claim.

5 Collier on Bankruptcy ¶ 1111.02 at 1111–12 (15th ed. 1991) ("Collier"). Thus, a nonrecourse creditor would have received the value of the collateral but no deficiency claim.

The Senate version contained a proposed § 1129(d),[9] which sought to protect the rights of secured creditors and would have severely restricted modification of real estate liens.

The purpose of section 1129(d) of S.2266 was to prevent a trustee, debtor, or other proponent of a plan of reorganization from forcing an entity holding a claim secured by *real* property from accepting less than the full amount of the entity's claim provided that the secured party's loan was made in connection with the purchase or improvement of the real property. Section 1129(d) of S.2266, thus, would have prevented the court from confirming a plan of reorganization in the absence of the secured party's

---

**7.** *See generally* Collier ¶ 1111.02, at 1111–17–19 (discussion on the use and possible abuse of Chapter XII).

**8.** *See In re Pine Gate Associates, Ltd.,* 2 B.C.D. 1478 (Bankr.N.D.Ga.1976); *In re Marietta Cobb Apartments Co.,* 3 B.C.D. 720 (Bankr.S.D.N.Y.1977); *In re Hartsdale Associates,* 3 B.C.D. 460 (Bankr.S.D.N.Y.1977); *In re Hobson and Pike Associates, Ltd.,* 3 B.D.C. 1205 (Bankr.N.D.Ga.1977).

**9.** Section 1129(d) of S.2266 provided:
Notwithstanding any other provision of this chapter or section 506(a) of this title, the claim or interest of a creditor secured by a lien upon or security interest in property of the estate which is real estate, chattels real, leasehold estates in real property, or fixtures, to the extent that such claim or interest was incurred for the purchase or improvement of

such property, may be altered or modified in the plan only in the following manner:
(1) Where a default in payment of an installment claim or interest is existing, the claim or interest of the creditor may be reinstated whether or not reinstatement would be permitted under otherwise applicable law with all payments then in default to be amortized equally over the life of the reinstated loan at the same rate of interest; or
(2) the claim or interest of the secured party may be extended as a payment on a reasonable, equitable, and practicable basis as along as the value of the claim or interest as extended would be the indubitable equivalent of the claim or interest if reinstatement under subsection (1) above.
In other drafts of S.2266, substantially similar provisions appear as proposed § 1131(a).

consent by valuing the collateral pursuant to section 506(a), and providing for payment over time of the appraised value of such property.

Collier ¶ 1111.02, at 1111–13 (emphasis in original). The Senate version required consent if the secured creditor was to receive less than the full amount of its claim.

The deficiencies of both the House and the Senate versions are illustrated through the following hypothetical:

A public utility company is in chapter 11; prior to the filing date, the company borrowed $20 million to finance the construction of a generating plant and granted the lender a lien on the plant; on the filing date, the plant had a fair market value of $10 million, as determined by the court pursuant to section 506(a). Under H.R. 8200 the lender would have an allowed secured claim of $10 million, and provided that the lender had recourse, an allowed unsecured claim of $10 million. In order to confirm a plan, the debtor would have been required to pay the lender $10 million over time with interest at a market rate, as determined by the court. Such obligation would be secured by a lien on the property. The lender also would have an unsecured claim for $10 million. With respect to its $10 million unsecured claim, the lender would be entitled to receive its pro rata share of the payments, if any, provided in the plan.

If, however, the hypothetical lender had a nonrecourse loan, it would have an allowed secured claim of $10 million. The lender would be barred from asserting an unsecured claim since such a claim would not be allowable by reason of section 502(b)(1). Therefore, under chapter 11 of H.R. 8200 the lender could have been stayed from foreclosing its lien, its right to gain possession of its collateral would have been cut off by reason of the "cram down" power, and it could have been left with a significantly reduced secured claim limited to the amount of the court determined value of the creditor's collateral and no unsecured claim.

Although section 1129(d) of S.2266 was intended to mitigate the harshness of the cram down sections of the Act in our hypothetical case, the effect of section 1129(d) would have been to give the lender veto power over the debtor's reorganization plan and thus to place the lender in a position to force the utility to either abandon the plant or liquidate its assets under Chapter 7 of the Code by reason of its inability to confirm a plan without the lender's consent.

Collier ¶ 1111.02, at 1111–13–14.

The treatment of single asset real estate cases that emerged from the House and Senate conference was altogether unique. The compromise selectively included portions of Chapters X, XI, and XII of the Act in a single reorganization chapter [10] and provided specific protections for secured creditors in §§ 363(k),[11] 1111(b), 1122, and 1129(b) of the Code. Although a single reorganization chapter was a novel concept, Congress was optimistic that Chapter 11 would be flexible enough to meet all the needs of large publicly held corporations, individuals, closely held businesses, and

---

**10.** Congress developed Chapter 11 as "[a] single chapter for all business reorganizations [to] simplify the law by eliminating unnecessary differences in detail that are inevitable under separately administered statutes." *Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 2203 n. 5, 115 L.Ed.2d 145 (1991) (Stevens, J., dissenting) (quoting legislative history).

**11.** The protections afforded a secured creditor are different when the debtor proposes to sell the creditor's collateral. In the context of a sale, assuming an arm's length transaction, competitive bidding ensures that the sales price reflects the value of the creditor's secured claim.

The secured creditor's protection is the right to credit bid its claim under § 363(k).

Alternatively, when a debtor proposes a plan that contemplates retention of the collateral, § 506(a) provides the method for determining the value of the secured claim. The creditor then has the option under § 1111(b) of receiving either the value of its secured claim and an unsecured claim, or having its total claim treated as fully secured. The difference in approach may be the result of the perceived "greater good" of a confirmed plan which provides, to the maximum extent possible, a recovery by all creditors and holders of interests.

real estate partnerships. 124 Cong.Rec. H11117 (1978) (remarks of Rep. McClory).

## 2. The Compromise Effectuated By Section 1111(b)

The courts that have concluded that the new value exception did not survive enactment of the Code have not considered § 1111(b). The House and Senate Conference Committee compromised the divergent House and Senate versions regarding cram down for undersecured creditors through § 1111(b). The floor statements of Representative Edwards and Senator DeConcini emphasize the importance of § 1111(b):

> Section 1129(b) is new. Together with section 1111(b) and section 1129(a)(7)(C), this section provides when a plan may be confirmed, notwithstanding failure of an impaired class to accept a plan under section 1129(a)(8). Before discussing section 1129(b) an understanding of section 1111(b) is necessary.

124 Cong.Rec. H11103–05, S17420–22 (1978).[12]

In the context of a plan, § 1111(b) provides protection for the undersecured creditor. The creditor may elect to have its claim treated as fully secured, entitling the creditor to a stream of payments equal to the full amount of the debtor's obligation. Alternatively, the creditor can split its claim. By splitting its claim, the creditor will have a secured claim in the amount of the value of its collateral and an unsecured claim for the balance of the obligation. The creditor obtains both the voting rights of a unsecured claimant for its unsecured claim, as well as a vote for its secured claim. The choice belongs to the secured creditor.

■ The pivotal question is whether the effect of the split claim under § 1111(b) is to provide the undersecured creditor with a blocking vote or simply an unsecured claim. The Fifth Circuit in *Greystone* assumes that Congress intended to provide undersecured creditors with absolute control over reorganization negotiations. The Fifth Circuit's approach in *Greystone* would have

the same effect as if the Senate version which contained § 1129(d) had been enacted. As Collier explains, Congress specifically chose not to provide a "veto power" to the lender which would force the debtor to "either abandon the [real property] or liquidate its assets under Chapter 7 of the Code by reason of its inability to confirm a plan without the lender's consent." Collier ¶ 1111.02, at 1111–14. Instead, Collier describes § 1111(b) as "an attempt by Congress to create a balance between the debtor's need for protection and a creditor's right to receive equitable treatment." *Id.* Thus, this court declines to adopt the interpretation of § 1111(b) that would provide undersecured creditors a blocking vote or veto power.

## 3. The New Value Exception Is Found Within The Confines Of The Code

■ The notion that "[t]he definition of 'fair and equitable' is no longer a matter of common law" and that "§ 1129(b)(2) defines it expressly," *see Kham & Nate's Shoes*, 908 F.2d at 1361, is simply not supported by the legislative history. Section 1129(b)(2) only sets the "minimal standards" for determining whether plans are fair and equitable. *Matter of D & F Construction Inc.*, 865 F.2d 673, 675 (5th Cir. 1989). In codifying the absolute priority rule as a minimal standard of "fair and equitable," Congress actually sought to diminish the role of the absolute priority rule. *See* Ralph A. Peeples, *Staying In: Chapter 11, Close Corporations And The Absolute Priority Rule*, 63 Am.Bankr.L.J. 65, 75 (1989).

■ The legislative history states that there was only a "partial codification" of the absolute priority rule. *See* H.R.Rep. No. 595, 95th Cong., 1st sess. 413–18 (1977), U.S.Code Cong. & Admin.News, 5787, 6369–6374 (1978). This partial codification was not intended to eliminate other aspects of the term "fair and eq-

---

**12.** The floor statements of Representative Edwards and Senator DeConcini are considered highly persuasive. *Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 2266 n. 5, 110 L.Ed.2d 46 (1990).

uitable." [13]   According to the legislative history:

> Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to "fair and equitable" treatment of a dissenting class.

124 Cong.Rec. H11103–04, S17420–22.

The Supreme Court in *Los Angeles Lumber* was faced with the task of interpreting the meaning of "fair and equitable" under § 77B of the Act. In discussing the development of the term "fair and equitable," the Court stated that:

> The words "fair and equitable" as used in § 77B(f) are words of art which prior to the advent of § 77B acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations. Hence, as in case of other terms or phrases used in that section [citations omitted], we adhere to the familiar rule that where words are employed in an act which had at the time a well known meaning in the law, they are

used in that sense unless the context requires the contrary.

*Los Angeles Lumber*, 308 U.S. at 115, 60 S.Ct. at 6.

One aspect of the fixed meaning of "fair and equitable" was the new value exception. *Id.* at 117, 60 S.Ct. at 7. In light of the established interpretation of fair and equitable, and the absence of any Congressional intent to alter its substantive meaning, it is doubtful that Congress intended to eliminate the new value exception. *See Kelly v. Robinson*, 479 U.S. 36, 46–50, 107 S.Ct. 353, 359–61, 93 L.Ed.2d 216 (1986) (interpreting dischargeability for criminal acts). The plain meaning of § 1129(b) and the statutory context of the Code do not indicate that Congress intended to abrogate a century of jurisprudence surrounding the term "fair and equitable."

■ It is well accepted that the policy of the Code is to foster negotiations and consensual plans of reorganization.[14] Other provisions of the Code evidence an attempt to balance the negotiations between debtors and creditors. The Code provides for the debtor (1) to act as trustee while operating the debtor's business;[15] (2) to have the exclusive right to file a plan for the first 120 days of a bankruptcy case;[16] and (3) to place a claim or interest in a particu-

---

**13.** For instance, the step-up exception was within the term "fair and equitable" under pre-Code law. *Los Angeles Lumber*, 308 U.S. at 117, 60 S.Ct. at 7. The step-up exception permits distribution to senior creditors of identical securities to junior creditors in satisfaction of their claims so long as the senior creditors are compensated for their loss of priority. Kenneth N. Klee, *Cram Down II*, 64 Am.Bankr.L.J. 229, 233 (1990). The legislative history to § 1129(b) states that "[t]he partial codification of the absolute priority rule here is not intended to deprive senior creditors of compensation for being required to take securities in the reorganized debtor that are of an equal priority with the securities offered to a junior class." H.R.Rep. No. 595, 95th Cong., 1st sess. 413–18 (1977). The codification of the absolute priority rule in § 1129(b) was, therefore, not intended to eliminate the step-up exception, and, inferentially, the new value exception.

**14.** The legislative history elaborates on the approach adopted under the Code:

> The premise of the bill's financial standard for confirmation is the same as the premise of

the securities law: parties should be given adequate disclosure or relevant information, and they should make their own decision on the acceptability of the proposed plan or reorganization. The bill does not impose a rigid financial rule for the plan. The parties are left to their own to negotiate a fair settlement. The question of whether creditors are entitled to the going-concern or liquidation value of the business is impossible to answer. It is unrealistic to assume that the bill could or even should attempt to answer that question. Instead, negotiation among the parties after full disclosure will govern how the value of the reorganizing company will be distributed among creditors and stockholders. The bill only sets the outer limits on the outcome: it must be somewhere between the going-concern value and the liquidation value.

H.R.Rep. No. 595, 95th Cong., 2d sess. 224 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6183–84.

**15.** *See* 11 U.S.C. §§ 1107, 1108.

**16.** *See* 11 U.S.C. § 1121(b).

lar class in formulating a plan of reorganization.[17]

By permitting undersecured creditors to control reorganization negotiations, debtors in single asset real estate cases would have little incentive to seek bankruptcy protection.[18] The practical result would be that many cases reorganized under Chapter XII would likely be excluded from the protections of Chapter 11. This exclusion is not consistent with the concept of Chapter 11 as a single chapter flexible enough to meet the needs of various debtors.[19]

### C. The New Value Exception Is Not Too Amorphous For Judicial Application

1. Judicial Concerns About Application Of The New Value Exception

■ From the language of Justice Douglas' opinion in Los Angeles Lumber, 308 U.S. at 117–21, 60 S.Ct. at 7–10, courts have distilled several requirements for applying the new value exception. See Peeples, 63 Am.Bankr.L.J. at 78–96 (and cases discussed therein). The conditions are that the value be (1) new, (2) necessary, (3) reasonably equivalent to the interest being received, (4) substantial, and (5) in money or money's worth. These standards are not without substance. See, e.g., In re Potter Material Service, 781 F.2d 99, 101–02 (7th Cir.1986) (cash and renewed guarantee were new contributions); In re Marston Enterprises, Inc., 13 B.R. 514, 517 (Bankr.E.D.N.Y.1981) (owners must be only source of new capital to be necessary); In re Sawmill Hydraulics, Inc., 72 B.R. 454, 456 (Bankr.C.D.Ill.1987) (value of proposed contribution must at least be equal to or greater than interest being retained); In re Rudy Debruycker, 84 B.R. 187, 190 (Bankr.D.Mont.1988) (proposed $50,000 is not substantial when unsecured claims exceed $1,200,000); Ahlers, 485 U.S. at 204, 108 S.Ct. at 967 (future services are not money or money's worth).

Although decided before the Supreme Court's decision in Ahlers, Potter Material Service illustrates how these standards are applied. The Seventh Circuit affirmed the findings of the bankruptcy court and district court in allowing the new value exception. The court noted that the appellant presented no evidence of a more feasible source for the new capital, and submitted no plan of its own that might have demonstrated an alternative approach. Id. at 102. The lower courts considered evidence of the debtor's past earnings records, the state of the economy, the competitive nature of the business, the debtor's current financial position, and projected earnings, as well as the source of contributed capital and economic risks in determining the value of the proposed contribution. Id. at 102–03.

Many courts have recognized the existence of the new value exception, but there are only a handful of opinions which have

17. See 11 U.S.C. § 1122(a). Although the plan proponent should not use this right to construct classes without legitimate business reasons, Congress did provide the plan proponent with wide discretion to designate appropriate classes.
There is great divergence of authority concerning the limits of the debtor's discretion in classifying claims. The Ninth Circuit has not addressed this issue since the adoption of the Code, but the Third, Fifth, Sixth, Eighth and D.C. circuits have advocated the view that the classification provisions of § 1122 should be applied flexibly. See Hanson v. First Bank of South Dakota, N.A., 828 F.2d 1310, 1313 (8th Cir.1987); Matter of Jersey City Medical Center, 817 F.2d 1055, 1061 (3rd Cir.1987); In re U.S. Truck Co., Inc., 800 F.2d 581, 586–87 (6th Cir. 1986); In re AOV Industries, Inc., 792 F.2d 1140, 1156 (D.C.Cir.1986); Matter of LeBlanc, 622 F.2d 872, 879 (5th Cir.1980); but see Greystone, 948 F.2d 134 (5th Cir.1991). This court joins with that authority which holds that the debtor has wide discretion in establishing classes.

18. Similar problems arise in cases filed by closely held corporations, see Ralph A. Peeples, Staying In: Chapter 11, Close Corporations And The Absolute Priority Rule, 63 Am.Bankr.L.J. 65 (1989), and in cases filed by individuals, see H. Gray Burks, IV, Application Of The Absolute Priority Rule To Exemptible And Abandonable Property—Is Cramdown Eliminated In Individual Chapter 11's?, Jan. 1991 Norton Bankr.L.Adv. 1.

19. Where "the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters[,]" that construction should be rejected. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

confirmed plans that rely on the new value exception.[20] Recognition of the exception has not led to a "freewheeling view of reorganization policy," *see Greystone, supra,* but it has maintained balance at the negotiating table.

Some courts and commentators have expressed suspicion regarding the financial motives for investing new capital in an insolvent enterprise. *See Kham & Nate's Shoes,* 908 F.2d at 1359; James J. White, *Absolute Priority And New Value,* 8 Thomas M. Cooley L.Rev. 1, 22 (1991). Owners, however, may have non-economic reasons for retaining their interest. The owner may be motivated by concern over financial reputation, sentimentality, acquired expertise in a business, or a desire to remain self-employed.

### 2. Applying Fair And Equitable Standards To The Instant Case

Courts demand less detailed showings of confirmability during the first four months in which the debtor has the exclusive right to file a plan. *Timbers,* 484 U.S. at 376, 108 S.Ct. at 633. Since the inception of this case, the energy of counsel has been directed toward litigation. No energy has been devoted to negotiating for the benefit of the estate.

This court concludes there is a new value exception and that it is possible for the debtor to propose a confirmable plan. However, the plan outlined by the debtor arguably imposes a hardship upon First Republic by requiring that the restructured loan be maintained for eighteen years, which is substantially longer than the property is expected to be unmarketable. It also can be argued that the debtor's proposed payment, whether or not First Republic makes the election, is not sufficiently substantial to meet the standards of "fair and equitable."

In this case the exclusivity period has now expired. First Republic may file a competing plan of reorganization and the parties can negotiate in earnest. Although there appears to be no perfect solution, this court prefers an interpretation of the Code that encourages negotiation and consensual plans. The goal of the negotiation process is to enhance the recovery by creditors and equity interests. The court can subsequently determine whether either party can propose a plan which is fair and equitable. The interpretation of judicially created standards defining the term "fair and equitable" will continue as a safeguard against abuses in the reorganization process.

### V. Conclusion

In considering First Republic's motion for relief from the automatic stay, the court concludes that it is possible for the debtor to confirm a plan within a reasonable time. First Republic's motion is, therefore, DENIED without prejudice.

---

**20.** *See, e.g., In re Potter Material Service,* 781 F.2d 99 (7th Cir.1986); *In re 222 Liberty Associates,* 108 B.R. 971 (Bankr.E.D.Pa.1990); *In re Aztec Co.,* 107 B.R. 585 (Bankr.M.D.Tenn.1989); *In re Henke,* 90 B.R. 451 (Bankr.D.Mont.1988); *In re Star City Rebuilders, Inc.,* 62 B.R. 983 (Bankr.W.D.Va.1986); *In re Landau Boat Co.,* 13 B.R. 788 (Bankr.W.D.Mo.1981).