**In re MAIN ROAD PROPERTIES, INC., Debtor.**

**Bankruptcy No. 91–12431.**

United States Bankruptcy Court, D. Rhode Island.

May 13, 1992.

Gloria C. Dahl, Murphy & Murphy, Jamestown, R.I., for debtor.

Joseph M. DiOrio, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Bank of Boston Connecticut.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on March 2, 1992 on Bank of Boston Connecticut's Motion for Relief From Stay, and on March 5, 1992 on the Bank's objection to the Debtor's Disclosure Statement. Because the claim classification issue raised by the Bank in its relief from stay motion, and again in its objection to approval of the Disclosure Statement, deals with the confirmability of the Debtor's proposed Plan, we reserved ruling on the relief from stay motion, and afforded the parties time in which to submit memoranda addressing both proceedings. They have done so, and the Motion for Relief From Stay and the classification issue are now ripe for decision.

## FACTS

1. On or about January 29, 1988, the Bank made a $750,000 revolving loan to the Debtor.

2. On January 29, 1988, Debtor executed an open end mortgage to secure all present and future indebtedness. The mortgage was recorded in the Tiverton, Rhode Island, Land Evidence Records and constitutes a valid and enforceable first mortgage under R.I.Gen.Laws § 34–25.

3. The mortgage is presently secured by three parcels of unimproved real estate in Tiverton, Rhode Island, consisting of approximately 50 acres of rural land in an "R–80" zone. The subject property used to be a larger parcel, of which sections were sold off prior to the commencement of the Bank's foreclosure action.

The Bank's appraiser, Mark Bates, and the Debtor's real estate expert, Terri Holland (a broker), both testified that the sub-ject property is in a "high end" location, ideally suited for residential development. Based on Bates' projected development and sale of 14 home sites over a five year period, and using comparable sales in the Tiverton area, he determined that the present fair market value of the subject property was $425,000. In an addendum to his written appraisal Mr. Bates opined that due to the poor economy in the region and its impact on real estate prices, it was not currently economically feasible to develop the property. The Debtor did not challenge this value, but offered testimony through Ms. Holland that the sale of 14 lots, over time, would gross approximately $1,150,000.[1]

4. The note matured on February 1, 1991, with all sums then due and payable immediately, and when the borrower defaulted the Bank commenced foreclosure proceedings. The mortgagee's sale was scheduled to take place on September 19, 1991, but the filing of the Debtor's Chapter 11 petition that morning prevented the sale.

5. As of the petition date, the principal and interest due under the note was approximately $518,424. Interest, costs and expenses continue to accrue.

6. Real estate taxes due as of January 23, 1992 are $2,080.

7. The property is not currently generating any income.

8. Glenconn, Inc., which holds an unsecured claim in the amount of $727,077, is a Connecticut corporation controlled by Roger B. Clark, the President and controlling shareholder of the Debtor.

## RELIEF FROM THE AUTOMATIC STAY

The Debtor acknowledges that it has no equity in the subject property, but focuses its argument on 11 U.S.C. § 362(d)(2)(B) (necessity to an effective reorganization). Roger Clark, the principal of the Debtor, testified that Tiverton Planning Board ap-

1. The disparity in appraisals is attributable mainly to the comparable properties used and each appraisers' differing assumptions regard-ing the feasibility of development at this juncture.

proval for the subdivision was obtained in February, 1991, although a roadway bond is not yet in place. Clark also testified that he has obtained a financing commitment for the development of the subdivision from First National Realty Associates, Inc., a publicly-traded corporation with executive offices in Atlanta, Georgia. Clark is a Director of First National.

First National Senior Vice President, Salvatore Bucci confirmed Clark's representation as to First National's financing commitment. In terms more fully outlined in the Debtor's amended Disclosure Statement, First National's commitment takes the form of a joint venture agreement between the Debtor and First National, whereby First National will provide a letter of credit or other collateral sufficient to enable the Debtor to post the required road construction bond ($230,000). First National will also provide financing for road construction costs, estimated at $200,000. In return, First National is to receive 50% of all lot sales revenue, less the funds required for servicing and retiring the Bank's mortgage. First National will also receive a second position mortgage on the subject property, as well as a reservation of 50% of the profits realized on the sale of speculation houses.

Mr. Clark testified that an additional commitment to pay certain priority and unsecured claims of the Debtor, consisting of town taxes and engineering and surveying fees up to $3,900.00, has been made by Glenconn.

■ We conclude, based on the evidence, that the commitments of First National and Glenconn establish, for the purpose of this § 362(d)(2)(B) hearing, that a plan of reorganization is reasonably in prospect. *See United Sav. Ass'n v. Timbers of Inwood Forest Ass'n, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Despite our skepticism as to the ratio of "good will" value ($11,000,000), to more tangible assets in the First National balance sheets, the evidence is sufficient to meet the feasibility requirement for a plan in prospect, at this stage in the Debtor's case.[2] *See In re U.S.*

*Advertising*, 131 B.R. 537 (Bankr.D.R.I. 1991); *In re Swansea Consolidated Resources*, 127 B.R. 1 (Bankr.D.R.I.1991).

■ We also find, for purposes of § 362(d)(1) that although the Debtor has little or no equity in the subject property, since it is not a wasting asset that will deteriorate pending confirmation of a plan, the Bank's present interest is adequately protected; and (2) that the property is necessary to an effective reorganization. Relief from stay is, therefore, DENIED.

## CLASSIFICATION OF THE BANK'S UNSECURED CLAIM

■ The Bank also argues that the plan as proposed is not confirmable because it improperly classifies the unsecured portion of its claim, in violation of § 1122 of the Bankruptcy Code. The Debtor placed the Bank's unsecured portion of its claim in a class separate from the claims of other unsecured creditors in order to maintain a class of impaired creditors which presumably will accept a cramdown under 11 U.S.C. § 1129(b), free from what otherwise would amount to the Bank's veto power. We note initially that while the Bank's objection raises substantive plan issues which are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face. *See In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr.D.Mass.1991) (permissible to pass upon confirmation issues where plan is fatally and obviously flawed); *In re Eastern Maine Electric Coop., Inc.*, 125 B.R. 329, 333 (Bankr.D.Me.1991) (patent inadequacies in plan should be addressed at disclosure statement stage); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr.N.D.N.Y.1988).

Section 1122 of the Code provides that:

**§ 1122. Classification of claims or interests.**

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class

---

2. The petition was filed on September 19, 1991.

only if such claim or an interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).

■ The Bank argues that the proposed classification effectively nullifies its unsecured voting rights, and is an impermissible gerrymander of voting classes. The Bank relies upon *Granada Wines, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir.1984), in which the Court of Appeals for the First Circuit held that separate classification of claims of unsecured creditors is justified only where the legal character of said claims is such to accord them a status different from the other unsecured creditors. *Id.* (citing *In re Los Angeles Land and Investments, Ltd.*, 282 F.Supp. 448, 453 (1968), *aff'd*, 447 F.2d 1366 (9th Cir. 1971)).[3]

The Debtor has recognized the First Circuit's admonition on this issue, but cites to a recent (allegedly distinguishable) Bankruptcy Court holding that an undersecured creditor's right to make a § 1111(b) election to treat all debt as secured, creates a status different enough to warrant separate classification. *See In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991), *motion for leave to appeal denied* (D.Mass. February 28, 1992), *appeal docketed*, No. 92–1417 (1st Cir. April 10, 1992). In *Bjolmes*, the Bankruptcy Judge noted that the legal distinction between the FDIC's unsecured claim and other unsecured creditors manifests itself not, for example, in the necessity for an appraisal to establish the claim, or in the presence of personal guarantees, but in the FDIC's legal right as an undersecured creditor to make a § 1111(b) election to have its claim treated as fully secured. This election was unavailable to the other unsecured creditors in *Bjolmes*.

■ The Bank points out, and we agree, that *Bjolmes* does not accord with decisions in other circuits, including the Fifth and Eighth. *See Matter of Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991) (substantially similar claims sharing common priority should be classed together). *See also Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987) (separate treatment of undersecured portion of claim does not warrant separate classification). We prefer the rationale and the result obtained in *Granada Wines, Greystone*, and *Hanson*, and adopt the analysis in an even more recent Massachusetts bankruptcy court decision, rendered on facts similar to those in both *Bjolmes* and the instant case. In that case the Court held that the right of an undersecured creditor to elect § 1111(b) treatment of its claims does not constitute a "legal distinction" meriting separate classification. We are referring to *In re Cantonwood Associates*, 138 B.R. 648 (Bankr. D.Mass.1992), where the Court concluded that the Debtor improperly placed deficiency claims of undersecured creditors in classes separate from the unsecured trade creditors. In recognition of the principle that all creditors of equal rank should be placed in the same class, Judge Goodman rejected the "policy" of one section of the Bankruptcy Code over another, to save the Debtor's cramdown scheme. He also observed that in the vast majority of single asset cases where separate classification of deficiency and trade claims is not permitted, *numbers*, not policy, should dictate the outcome, since the undersecured creditor usually holds at least two-thirds in amount of the claims in the unsecured creditor class. *Id.* at 654.

The Debtor also cites *In re Triple R Holdings, L.P.*, 134 B.R. 382 (Bankr. N.D.Cal.1991), where a California Bankruptcy Court criticized *Greystone* for permitting undersecured creditors in a single

---

**3.** The *Granada* court refused to find a legal distinction meriting separate classification of a debtor's pension fund withdrawal liability in its Chapter 11 plan. The plan provided for dividends payable to the class at a reduced rate from that paid to unsecured creditors. The debtor's rationale for the classification was that,

had it filed its petition under Chapter 7, § 4225(b) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*, would have limited the pension fund to a dividend based on fifty per cent of its claim. The court rejected that distinction as a basis for separate classification.

asset case to control reorganizations, on the ground that this would create an unhealthy disincentive to potential Chapter 11 debtors. *Id.* at 391. For the reason expressed in the previous paragraph—that numbers should determine the issue of creditor control—we reject the California Court's legislative history analysis in *Triple R, i.e.* that such a blocking technique would emasculate a debtor's ability to negotiate, would go beyond general principles of creditor control, and would accord such creditors preferred treatment. *See* H.R.Rep. No. 595, 95th Cong., 2d sess. 224 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6183 ("negotiation among the parties after full disclosure will govern how [for example] the value of the reorganizing company will be distributed among creditors and stockholders."); *Triple R,* 134 B.R. at 390.

Accordingly, we agree with the reasoning and follow the result in *Cantonwood* as the appropriate resolution of the issue before us, and on that basis sustain the Bank's objection to the Debtor's Disclosure Statement.

The Debtor is allowed twenty (20) days within which to file a second amended Disclosure Statement and Plan, consistent with this opinion.