## MASON *v.* PARADISE IRRIGATION DISTRICT.

No. 306. Submitted December 4, 1945.—Decided January 7, 1946.

---

Petitioner submitted *pro se*.

*Mr. P. M. Barceloux* submitted for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent is organized under the laws of the State of California and located in the County of Butte of that State. It experienced financial difficulties in the 1930's. It had outstanding $476,000 principal amount of bonds bearing interest at the rate of 6 per cent. Being unable to collect taxes sufficient to service the bonds, it tried to work out a debt readjustment program. It applied for a loan from the Reconstruction Finance Corporation. A loan of $252,500 was arranged, provided all the holders of the outstanding bonds agreed to the refinancing pro-

gram. The offer to the bondholders was that they surrender their bonds for 52.521 cents on each dollar of principal, exclusive of interest—an amount which respondent deemed fair to the bondholders and to the owners of the land in the district. The holders of about 92 per cent of the principal amount of the outstanding bonds agreed. Respondent, being unable to obtain the assent of the holders of the remaining bonds, filed its petition under Ch. IX of the Bankruptcy Act late in 1937. 50 Stat. 653, 52 Stat. 939, 54 Stat. 667, 11 U. S. C. § 401. It submitted with its petition its plan of composition or debt readjustment and prayed, *inter alia,* that the plan be approved. The plan provided that the holders of the outstanding bonds be paid in cash 52.521 cents on each dollar of principal, exclusive of interest; that the cash was to be supplied from the proceeds of a loan of $252,500 from the Reconstruction Finance Corporation; that the Reconstruction Finance Corporation was to receive new or refunding 4 per cent bonds in the principal amount of its loan, and 4 per cent on all disbursements from the date thereof until the new or refunding bonds were issued to it. The petition recited that the creditors owning not less than 92 per cent in amount of the bonds had accepted the plan and consented to the filing of the petition.[1] It appears that the consenting bondholders had deposited their bonds under the plan; that the Reconstruction Finance Corporation did not advance the funds to respondent but, acting through a bank, purchased the bonds at the composition figure and registered the bonds in its name; that in accordance with the terms of the contract between respondent and the Reconstruction Finance Corporation,

---

[1] Sec. 403 (a) requires the petition to state, *inter alia,* that "creditors of the petitioner owning not less than 51 per centum in amount of the securities affected by the plan (excluding, however, any such securities owned, held, or controlled by the petitioner), have accepted it in writing."

the old bonds so acquired remained obligations of respondent, were held by the Reconstruction Finance Corporation as security for its advances and are to be exchanged under the plan for 4 per cent refunding bonds. The Reconstruction Finance Corporation, as holder of about 92 per cent of the bonds, approved the plan prior to the filing of the petition under Ch. IX.

The District Court found that all of the outstanding bonds were of one and the same class,[2] that the requisite percentage of bondholders had approved the plan,[3] that respondent was unable to meets its debts as they matured,[4] and held that the plan was fair, equitable and for the best interests of its creditors and did not unfairly discriminate in favor of any creditor.[5] It accordingly approved the plan.[6]

Petitioner is the owner of $29,000 principal amount of the old bonds who opposed the plan of composition. His objections were not sustained in the District Court. The Circuit Court of Appeals likewise overruled them. 149 F. 2d 334. The case is here on a petition for a writ of certiorari which we granted because of a conflict among

[2] Sec. 403 (b) provides that "the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources shall be of one class. The holders of claims for the payment of which specific property or revenues are pledged, or which are otherwise given preference as provided by law, shall accordingly constitute a separate class or classes of creditors."

[3] Sec. 403 (d) provides that a plan of composition shall not be confirmed, with exceptions not material here, "until it has been accepted in writing, by or on behalf of creditors holding at least two-thirds of the aggregate amount of claims of all classes affected" by the plan, excluding "claims owned, held, or controlled by the petitioner."

[4] Sec. 403 (a) requires the petition to state that the petitioner is "insolvent or unable to meet its debts as they mature." Among the findings required by § 403 (e) for confirmation of a plan is that it "complies with the provisions of this chapter."

[5] That finding is required by § 403 (e).

[6] November, 1943.

the Circuit Courts of Appeals,[7] limited to the question whether it was proper to approve a plan which treated petitioner differently from the Reconstruction Finance Corporation.

Petitioner argues that since he and the Reconstruction Finance Corporation were put in the same class, the rule of "equality between creditors" applicable in bankruptcy proceedings (*Clarke* v. *Rogers,* 228 U. S. 534, 548) required that they be treated alike. In other words, he contends that instead of being required to take 52.521 cents in cash on each dollar of principal, he should receive 4 per cent refunding bonds.

We held in *American United Ins. Co.* v. *Avon Park,* 311 U. S. 138, 147, that the principle of equality between creditors governed compositions under Ch. IX as it did compositions under the old § 12. The fact that the Reconstruction Finance Corporation holds the vast majority of all the bonds and therefore is in a dominant position in the reorganization does not mean that it is entitled to preferred treatment. It is clear that it is not. *American United Ins. Co.* v. *Avon Park, supra,* p. 148. The Reconstruction Finance Corporation has not by purchasing bonds in the market acquired merely a speculative position in the plan of composition. Nor is it merely in the position of a holder of a majority of the bonds. By contract with the debtor it has underwritten the whole refinancing program. It has ventured the capital necessary to effectuate the plan of composition. It has long been recognized in reorganization law that those who put new money into the distressed enterprise may be given a participation in the reorganization plan reasonably equiv-

---

[7] *Texas* v. *Tabasco School Dist.,* 132 F. 2d 62, 133 F. 2d 196, decided by the Fifth Circuit Court of Appeals, is to be contrasted to the decision below and to *West Coast Life Ins. Co.* v. *Merced Irrigation Dist.,* 114 F. 2d 654, decided by the Ninth Circuit Court of Appeals and also to *Luehrmann* v. *Drainage Dist.,* 104 F. 2d 696, decided by the Eighth Circuit Court of Appeals.

alent to their contribution. *Case* v. *Los Angeles Lumber Products Co.*, 308 U. S. 106, 117, 121–122 and cases cited; *Ecker* v. *Western Pacific R. Corp.*, 318 U. S. 448, 486–487. That rule is based on practical necessities. Without the inducement new money could not be obtained.

It is said, however, that the Reconstruction Finance Corporation when it becomes the holder of bonds must be treated on the basis that it is a creditor and not an outside lender of money. It is clear that Congress intended the Reconstruction Finance Corporation to be treated in situations like the present as a creditor. Sec. 402 of the Act provides that "Any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of the full face value thereof." The Reconstruction Finance Corporation is such an agency. Sec. 403 (j) gives securities acquired, as here, pursuant to a plan of composition prior to the filing of a petition the same recognition as any other securities.[8] It is thus apparent that securities acquired by the Reconstruction Finance Corporation, pursuant to a plan of composition, are not extinguished, remain securities "affected by the plan," [9] and may be computed in determining the

---

[8] Sec. 403 (j) reads as follows: "The partial completion or execution of any plan of composition as outlined in any petition filed under the terms of this title by the exchange of new evidences of indebtedness under the plan for evidences of indebtedness covered by the plan, whether such partial completion or execution of such plan of composition occurred before or after the filing of said petition, shall not be construed as limiting or prohibiting the effect of this title, and the written consent of the holders of any securities outstanding as the result of any such partial completion or execution of any plan of composition shall be included as consenting creditors to such plan of composition in determining the percentage of securities affected by such plan of composition."

[9] For a discussion of the history of § 403 (j) see *West Coast Life Ins. Co.* v. *Merced Irrigation Dist., supra* note 7, pp. 667–668.

percentage of consenting creditors necessary for the filing of a petition under Ch. IX.[10] If the Act were construed as requiring the Reconstruction Finance Corporation in situations like the present to be treated as every other creditor of the same class, the fact that it had underwritten the whole refinancing program would be considered irrelevant. But as we have seen, he who furnishes new capital to a distressed enterprise has long been accorded preferred treatment. The Reconstruction Finance Corporation contributes something that Mason does not. It furnishes the underwriting which makes the refinancing possible. It gives something of value for the preferred treatment which it receives. The other security holders of the same class give nothing new. That difference warrants a difference in treatment. *Case* v. *Los Angeles Lumber Products Co., supra; Ecker* v. *Western Pacific R. Corp., supra.* The plan, of course, must be fair and equitable and it must "not discriminate unfairly" in favor of any creditor. § 403 (e). A secret advantage would not meet that test. *American United Ins. Co.* v. *Avon Park, supra.* But here there was full disclosure to the security holders and to the court. Petitioner receives 52.521 cents on each dollar of principal amount of his bonds. The Reconstruction Finance Corporation receives new and refunding bonds in the face amount of its cash advances. It is, of course, possible that 52.521 cents in cash may not be as advantageous an offer as 52.521 cents in new and refunding bonds. But there is no showing that it is not. Hence it is impossible for us to say that, although a difference in treatment was warranted, any discrimination in favor of the Reconstruction Finance Corporation was so great as to be unfair.

A different question arises when we come to the classification of creditors for voting on a plan of composition.

---

[10] See note 1, *supra.*

Sec. 403 (b) provides that there shall be put in one class holders of all claims payable without preference from the same source.[11] While this provision states the general rule, we said in *American United Ins. Co.* v. *Avon Park, supra,* p. 146, that the bankruptcy court has the power to make a different classification where inequitable results would otherwise obtain. We assume that a majority bondholder who was receiving preferred treatment under a plan by reason of his underwriting or otherwise would normally have to be put in a different class when it came to voting on the plan. But we see no reason why Congress could not provide otherwise. As we have seen, § 402 allows the Reconstruction Finance Corporation to be treated as a creditor in the amount of the full face value of the securities it acquired. By reason of § 403 (j) those securities may be included in the percentage of consenting securities necessary for the filing of a petition under Chapter IX. Those provisions were inserted to make these refinancing programs possible and practical. They give statutory sanction to this particular method of refinancing. Sec. 403 (d) requires approval by creditors "holding at least two-thirds of the aggregate amount of claims of all classes" affected by the plan.[12] If that is construed to mean not two-thirds of each class but two-thirds of the total amount of all claims in all classes, the separate classification of the Reconstruction Finance Corporation would make no difference in result in the present case. For all of the bonds held by it are more than two-thirds of the aggregate amount of all claims affected by the plan. Only if the Act were construed to mean that two-thirds of each class is necessary for approval of a plan would the separate classification of the Reconstruction Finance Corporation produce a different result in this case. Such a construction, however, would place the success of these refinancing pro-

[11] See note 2, *supra.*
[12] See note 3, *supra.*

grams at the mercy of the minority interests. If it were necessary in this type of case to put non-assenting bond-holders in a separate class, they could block the refinancing program even though it were fair and equitable and the only feasible one which the debtor could work out. In designing this legislation Congress was solicitous not only to protect the position of the Reconstruction Finance Corporation in these refinancing programs[13] but also to give this class of debtors a workable and practical method of obtaining relief from oppressive debt burdens. That purpose would be thwarted or impeded if we gave Ch. IX a construction which placed the fate of these plans in the hands of minority, non-consenting bondholders. The aim to provide a method of forcing "recalcitrant minority creditors into agreement" (H. Rep. No. 517, 75th Cong., 1st Sess., p. 3) would be defeated. For once such a rule were announced minority bondholders would have a great nuisance value, making it worthwhile for them to lie back until they got their price.[14]

It is suggested that the plan might be approved without the consent of the minority if, as provided in § 403 (d), "provision is made in the plan for the protection of the interests, claims, or lien of such creditors or class of creditors." Provision "for the protection" of the claims of non-

[13] That the Reconstruction Finance Corporation would play an important role in these refinancing programs was in the forefront when this legislation was before Congress. See H. Rep. No. 517, *supra,* p. 4; 81 Cong. Rec. 6322.

[14] Congressman Sumners, Chairman of the House Judiciary Committee, stated during the debate: "The force of the bill is directed against that minority present in every effort of debtors and creditors to bring the total of amounts payable within the ability of the debtor to pay. It is the minority who try to take advantage of the general desire to settle to compel an advantage to themselves in order to remove their selfishly interposed obstruction. They are hold-up men operating within the law." 81 Cong. Rec. 6313. The same view was expressed by Senator Pepper who managed the legislation on the floor of the Senate. 81 Cong. Rec. 8543.

assenting creditors could be made by leaving them undisturbed. But the purpose of Ch. IX is to provide taxing agencies with a method of scaling down their debt structures and reducing their debt service requirements when the need for relief is shown. If the non-assenting creditors had the option to come in under the plan or to retain their old securities, the debtor would be unable to get the relief which Ch. IX affords, or could do so only on such terms as the minority dictated. The other alternative would be to abandon this type of refinancing. But as we have seen, it has statutory sanction. It is said, however, that provision "for the protection" of the claims of non-assenting creditors could be made in ways other than leaving the claims undisturbed. If, *arguendo,* we assume that is true, we see no reason why payment in cash of the full value of the claims would not be adequate. That is permissible in connection with reorganizations under Ch. IX. 52 Stat. 840, 11 U. S. C. § 616 (7). It is indeed the historic method of dealing with dissenters under plans of reorganization. *Case* v. *Los Angeles Lumber Products Co., supra,* p. 121, note 15. No reason is apparent why, under our assumption, the same could not be done under Ch. IX. Yet, even in that view, the present plan was properly confirmed. For there is no showing whatsoever that the full value of Mason's claims is more than 52.521 cents on the dollar which he receives in cash. The District Court, indeed, found that the cash offer was fair and equitable and we are unable to say that that finding was not warranted.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

The Court holds that the Reconstruction Finance Corporation is not to be treated as an ordinary bondholder-creditor but is entitled to preferred treatment because it

acquired the bonds of the debtor as part of an arrangement which made possible financing of the plan of composition. With this I agree. But I find nothing in Chapter IX which, while permitting the R. F. C. to be considered a preferred creditor for purposes of distribution, allows it to be classified among ordinary creditors for purposes of voting. Nor do considerations of policy require that the R. F. C. be given such a two-faced character. It is suggested that if the votes of a preferred creditor in the position of the R. F. C. could not be counted with the votes of the ordinary creditors that class might not furnish the necessary two-thirds of the aggregate amount of claims of that class. It must be remembered, however, that the mere failure of a class like that of ordinary creditors, *e. g.*, those having no preferred position in the scheme for distribution, to accept a plan of composition does not prove that its resistance is improperly or unfairly recalcitrant. *Cf. American United Ins. Co.* v. *Avon Park*, 311 U. S. 138, 148. And recognition that bondholders may exercise their statutory rights as common creditors not to assent does not, of course, make of them a separate class of non-assenting bondholders with a veto power over the plan. But if the recalcitrancy does represent a dog-in-the-manger attitude, Chapter IX would seem to have provided for the contingency. According to § 83 (d) of the Act, 50 Stat. 653, 657, 11 U. S. C. § 403 (d), a plan might be approved without the otherwise necessary vote, not only where the claims of the creditors "are not affected by the plan," but also where "provision is made in the plan for the protection of the interests, claims, or lien of such creditors or class of creditors." But, though the bankruptcy court has the power of dispensing with the need of an approving vote by a class of creditors, by protecting that class' interests, it is not available where the court has not in fact determined, as it has not in this case, that the dissent of that class was an abusive exercise of their right to veto a plan.

To give such flexible scope to § 83 (d),[1] though, like other provisions of Chapter IX, it is not free from ambiguity, is the more pertinent if, as suggested, Chapter IX requires approval of two-thirds not of each class of claims but of the total amount of all claims. See Remington, Bankruptcy (1939) § 4364. On the other hand, if approval of the plan by two-thirds of each class is required, such a requirement can only mean that a group of more than one-third of any class is capable of exercising the veto power, except when § 83 (d) can be invoked. In establishing these classes, creditors are not properly grouped who, on

---

[1] That this is a reasonable interpretation of § 83 (d) is indicated by the cumbersome but more detailed form in which the purpose of § 83 (d) is explained in an earlier draft of the Act:

". . . (3) shall, with respect to creditors whose acceptance is not required under the provisions of subdivision (e) of this section if their interests, claims, or liens are protected in the manner provided in this clause (3), provide adequate protection for the realization by them of the value of their interests, claims, or liens, if the property or revenue affected by such interests, claims, or liens is dealt with by the plan, either as provided in the plan, (a) by the transfer or sale of such property subject to such interests, claims, or liens, or such property shall continue to be held by the taxing district subject to such interests, claims, or liens, or (b) by a sale free of such interests, claims, or liens at not less than a fair upset price and the transfer of such interests, claims, or liens to the proceeds of such sale, or (c) by appraisal and payment in cash of the value of such interests, claims, or liens, or, at the objecting creditors' election, of the securities allotted to such interests, claims, or liens under the plan, if any shall be so allotted, or (d) by such method as will in the opinion of the judge, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection: *Provided,* That if provision therefor is made in the plan, the judge may require objecting creditors to accept, in lieu of any cash payment under this subdivision, such securities, of any kind, in payment of their interests, claims, or liens as shall, in the opinion of the judge, upon the consummation of the plan, represent the fair and equitable shares of such creditors in the property and revenues of the taxing district, available for the payment of its debts . . ." H. R. 5267, 73d Cong., 1st Sess. (1933) § 81 (b) (3), as it appears in the Hearings on that Bill, at page 17.

the face-value of the same bonds, get different equivalents, and are, as to the only thing that matters, not bound together by the same ties but separated by antagonistic interests. To put these groups with such antagonistic interests into the same class is to contradict the very notion of a class. Reason rejects such classification and nothing in the statute indicates that Congress intended to define a class as a group with inconsistent interests.