**In re SLC LIMITED V, a California Limited Partnership, Debtor.**

**Bankruptcy No. 91B–03012.**

United States Bankruptcy Court, D. Utah, C.D.

March 6, 1992.

Steven H. Gunn and Craig L. Taylor, of Ray, Quinney & Nebeker, Salt Lake City, Utah, for The Bradford Group West, Inc., creditor.

Paul J. Toscano, of Cohne, Rappaport & Segal, Salt Lake City, Utah, for debtor.

## MEMORANDUM DECISION AND ORDER

JUDITH A. BOULDEN, Bankruptcy Judge.

SLC Limited V (SLC V), a California limited partnership, filed this chapter 11 proceeding to protect its single real estate asset, a mixed use, commercial/retail center known as West Town Center (West Town). The Bradford Group West, Inc. (Bradford), an under-secured creditor with a claim secured by West Town, has contested SLC V's ability to reorganize from the inception of the case. The dispute between SLC V and Bradford arises in the context of a motion for relief from the automatic stay pursuant to 11 U.S.C. section 362(d)(2)(B).[1] The parties continue the presentation of evidence on the issue of whether there is a reasonable possibility that SLC V will successfully reorganize within a reasonable time, but, in the interim, have requested the court to determine whether

---

**1.** Future statutory references are to Title 11 of the United States Code unless otherwise noted.

the new value exception to the absolute priority rule will be adopted by this court. Whether the new value exception is available to SLC V is a pivotal issue. If SLC V cannot utilize the new value exception, it is doubtful that SLC V will be able to confirm a plan in light of Bradford's substantial unsecured claim.

## FACTS

SLC V filed this chapter 11 petition on May 7, 1991. The general partner is Loran Corporation (Loran)[2] and there is one limited partner. SLC V was formed for the purpose of acquiring, holding, developing, and operating West Town. SLC V obtained a construction loan from Bradford secured by West Town in January of 1986. The trust deed note executed by SLC V in favor of Bradford has a current balance due of approximately $2,294,000 as set forth in Bradford's proof of claim.[3] SLC V owes priority unsecured real property taxes for 1991 of approximately $35,000 and secured pre-petition real property taxes of $130,000. Unsecured pre-petition listed claims against SLC V total $242,000.[4] The parties agree that the value of West Town is $1,370,000. SLC V's other tangible assets have only nominal value.

The latest plan (Plan) proposed by SLC V provides for payment of various classes of creditors over time from SLC V's future income and capital contributions.[5] Pre-petition equity interest holders would be eliminated, except to the extent such holders or others contribute additional cash to SLC V. The new value contributors would receive, on account of their new capital contributions, equitable interest in SLC V, allegedly equal to the value of their new contributions. New capital is crucial to SLC V's Plan and without a substantial cash infusion confirmation is not feasible.

SLC V anticipates that the existing limited partner will commit to pay at least $125,000 to SLC V. The Plan anticipates that of the $125,000, fifty percent (50%) will be allocated to purchase a general partnership interest, and fifty percent (50%) will be applied to purchase a limited partnership interest. The Plan provides that to the extent that $62,500 is applied to purchase a limited partnership interest, the investor will be making a "new value" contribution to SLC V. The Plan provides that for the total cash infusion of $125,000, the investor will receive a return of eighteen percent (18%) per annum after all other classes, except the general unsecured class, have received payment as set forth in the Plan. SLC V's explanation of this provision is that it protects unsecured creditors by limiting the amount that the equity interest holder may receive on capital contributions to eighteen percent (18%). The effect of the provision is to grant the equity interest holder a return on investment prior to any distribution to general unsecured creditors. General unsecured creditors would receive payment on their claims from SLC V's residual cumulative net in-

---

2. Loran Corporation is the general partner for several limited partnerships currently under the protection of various bankruptcy courts. SLC V's partnership documents reflect that its general partner provided an initial capital contribution of $200,000 and its limited partner provided $320,000.

3. SLC V disputes the claim.

4. This figure does not include the under-secured portion of Bradford's claim, but does include $222,000 owed to Loran.

5. The Plan proposes that 1991 real property taxes would be paid on the effective date and the secured real property tax claim would be paid over time. Bradford's secured claim would be paid by amortizing the claim over twenty (20) years at eleven percent (11%) per annum, paid in sixteen (16) equal, quarterly installments, with a balloon payment of the balance due on June 30, 1996. Bradford would retain its lien and rights against the guarantors of the loan. The guarantors are Loran, its president and its vice president. An administrative convenience class of unsecured creditors with claims less than $2,000, or unsecured creditors electing to be paid in this class, would receive a lump sum payment of ninety percent (90%) of their claim paid after administrative claims and 1991 real property taxes. Unsecured creditors with claims in excess of $2,000, including Bradford's unsecured claim, would be paid any residual funds after payment of all other creditors and after an eighteen percent (18%) return on the capital contribution. Bradford would control this class and has indicated that it would vote against the Plan.

come only after payment of all expenses contemplated under the Plan and after the payment of the eighteen percent (18%) return on the total capital contribution.

## ISSUES

The narrow issue presented is whether this court recognizes the existence of the new value exception to the absolute priority rule.[6] The general unsecured creditor class controlled by Bradford's claim will not accept the Plan as it is presently structured. Therefore, section 1129(b)(1) applies to confirmation of the Plan. Bradford asserts that SLC V's Plan is not confirmable because it is not fair and equitable. SLC V asserts that its Plan falls within the new value exception to the absolute priority rule. The determination of the propriety of SLC V's Plan is a matter within the core jurisdiction of this court as set forth in 28 U.S.C. section 157(b)(2)(L) and this court can enter a final order resolving the issue.

## DISCUSSION

### The Absolute Priority Rule and the New Value Exception

■ The absolute priority rule requires that a dissenting class of creditors be provided for fully before any junior class may receive or retain any interest in the reorganized firm. *See, In re Future Energy Corp.*, 83 B.R. 470, 497 (Bankr.S.D.Ohio 1988). The absolute priority rule dates from the turn of the century under the law of equity receiverships. *See, Baird & Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule*, 55 U.Chi.L.Rev. 738, 739 (1988). It is consistent with the general principle that the assets of an entity should be distributed to pay the entities' creditors before any distribution to its equity interest holders. *See In re Bryson Properties. XVIII*, 129 B.R. 440, 446–47 (Bankr.M.D.N.C.1991). A series of Supreme Court decisions in cases concerning the precedence afforded creditors over shareholders in railroad reorganization cases set forth some of the parameters of the rule. *See Northern Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Louisville Trust Co. v. Louisville, New Albany & Chicago Ry. Co.*, 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899). In *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926), the Supreme Court reaffirmed the "fixed principle" that eventually became known as the absolute priority rule.

The Supreme Court also recognized the existence of what has been characterized as an exception to the absolute priority rule in certain circumstances arising from economic realities and equity. The economic situation was one in which the debtor could not reorganize without acquiring fresh capital, and where the only entities likely to infuse fresh capital into the insolvent entity were equity interest holders. If the equity interest holders could not retain an interest after reorganization, the prospect of a capital infusion to aid rehabilitation was slim. In *Kansas City Terminal Ry. Co.*, the Supreme Court indicated that a plan of reorganization that did not give precedence to the entire claim of the creditor over any interest of a stockholder could not be binding upon unsecured creditors. The court explained, however:

> We assume that to "give precedence" implies recognition of superior importance. As above stated, to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation. But it does not follow that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways. Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stock holders are permitted to contribute and retain an interest sufficiently valuable to move them.

*Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988).

---

**6.** The parties continue to litigate whether there is "a reasonable possibility of a successful reorganization within a reasonable time." *United*

In such or similar cases, the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.

*Kansas City Terminal Ry. Co.*, 271 U.S. at 455, 46 S.Ct. at 552.

In *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), Justice Douglas concluded that the absolute priority rule, as well as the exception, had been codified into law and incorporated into section 77B of the former Bankruptcy Act, under the requirement that a plan be "fair and equitable." These words, Justice Douglas writes, "are words of art which prior to the advent of Section 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations." *Los Angeles Lumber*, 308 U.S. at 118–19, 60 S.Ct. at 9; *see also In re Bjolmes Realty Trust*, 134 B.R. 1000 (Bankr.D.Mass.1991) (holding that the new value exception remains in the law under section 1129(b) and also providing a thorough discussion of the history of the fair and equitable rule). Justice Douglas affirmed, in *dicta*, the continued vitality of an exception to the "fixed principle" of the absolute priority rule that the Court had carved out in earlier cases:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Railway Co., v. Boyd, supra,* and *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra.* Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.

*Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10. As Justice Douglas stated without equivocation: "That rule is based on practical necessities. Without the inducement new money could not be obtained." *Mason v. Paradise Irr. Dist.*, 326 U.S. 536, 542, 66 S.Ct. 290, 292, 90 L.Ed. 287 (1946); *see also Ecker v. Western Pac. R.R. Corp.*, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 (1943).

When the Bankruptcy Code was enacted in 1978, section 77B of the Act was replaced by section 1129(b) of the Code. The term "fair and equitable" was not included as a definition in section 101 or section 1101. Instead, section 1129(b) provides certain requirements that give structure to the "fair and equitable" concept, but the requirements are not all inclusive nor are they limiting.[7] Section 1129(b) states in part:

> (2) For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> . . . .

> (B) With respect to a class of unsecured claims—

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

No specific mention of a new value exception is contained in section 1129(b)(2). Whether the new value exception continues to exist as a parallel or additional element to the requirements set forth in section 1129(b)(2)(B) has been the subject of considerable controversy. Those courts that have decided the issue are split. The Supreme Court brought the continued vitality

---

**7.** Congress used the term "include" in the language of section 1129(b). Section 102(3) defines "includes and including" as not limiting.

of the new value exception into question by its opinion in *Northwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In *Ahlers,* the Court specifically declined to resolve the issue, stating that "its decision today should not be taken as any comment on the continuing vitality of the Los Angeles Lumber exception—a question which has divided the lower courts since passage of the Code in 1978...." *Id.,* 485 U.S. at 203–4 n. 3, 108 S.Ct. at 966–67 n. 3.

### Statutory Construction and Legislative History

The controversy stirred by the Supreme Court's failure to interpret section 1129(b) in *Ahlers* prompted scores of persuasive academic articles and well-reasoned opinions on both sides of the question of whether the new value exception survived the 1978 Code.[8] This court finds that the better-reasoned position is that the new value exception to the absolute priority rule retains its vitality under the Code. The court reaches this conclusion with the guidance regarding statutory interpretation provided by the Tenth Circuit decision in *O'Connor v. United States Department of Energy,* 942 F.2d 771 (10th Cir.1991), and by the Supreme Court's recent decision in *Dewsn-up v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

Much of the confusion surrounding whether the new value exception was eliminated by the 1978 Code can be reduced by focusing on the plain meaning of the language of sections 1129(b) and 102(3). "When the language of a statute is clear and unambiguous, judicial inquiry is complete and that language controls absent rare and exceptional circumstances." *O'Connor,* 942 F.2d at 773, *citing Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Section 1129(b)(2) references some of the requirements of the "fair and equitable" standard, but on its face, it does not statutorily exclude nor eliminate the new value exception to the absolute priority rule. The use of the term "includes" also indicates that the requirements set forth in section 1129(b)(2)(B) are not limited to those indicated in that section.

In the event that it is appropriate to review the legislative history of section 1129(a)(2) in this context, the Supreme Court most recently provided guidance relating to interpretation of Code provisions in relation to legislative history in *Dewsn-up.*[9] Justice Blackmun, writing for the majority, noted that:

**8.** There are several positions and theories advanced by commentators regarding the new value exception. Although far from exhaustive, this list includes: White, *Absolute Priority and New Value,* 8 Thomas M. Cooley L.R. 1 (1991); Klee, *Cram Down II,* 64 Am.Bankr.L.J. 229 (1990); Peeples, *Staying In: Chapter 11, Close Corporations and The Absolute Priority Rule,* 63 Am.Bankr.L.J. 65 (1989); Ayer, *Rethinking Absolute Priority After Ahlers,* 87 Mich.L.R. 963 (1989); Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions,* 36 Emory L.J. 1009 (1987); *see also* Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 133 (1979); Blum and Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations,* 41 U.Chi.L.Rev. 651 (1974).

The briefs submitted by the parties in this case included a thorough compilation of opinions on either side of the issue and illustrated the depth of the controversy generated by the new value exception and the original Fifth Circuit opinion in *Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 948 F.2d 134 (5th Cir. 1991), *reh'g en banc denied,* 948 F.2d at 142 (1992). Since the date the briefs were submitted, a number of other courts have ruled on the issue, and continuing the trend, the courts have ruled on either side of the question: *In re Jack Sidney James,* 1992 WL 21365, 1992 Lexis 91, Case No. 90–03326–91P (Bankr.M.D.Fla., Jan. 2, 1992) (following the original Fifth Circuit opinion in *Greystone* without analysis); *In re Bonner Mall Partnership,* 1991 WL 330784, 1991 Lexis 1964, Case No. 91–00801–11 (Bankr.D.Idaho, Dec. 6, 1991) (finds the original Fifth Circuit analysis in *Greystone* "convincing" without further explanation); *In re Triple R Holdings, L.P.,* 134 B.R. 382 (Bankr.N.D.Cal. 1991) (refusing to adopt the original Fifth Circuit *Greystone* rationale); *Penn Mutual Life Insur. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership),* 134 B.R. 165 (Bankr.D.Md., Dec. 9, 1991) (infusion of new value is an independent act which is not a per se violation of the absolute priority rule).

**9.** In *Dewsnup,* the Court affirmed the Tenth Circuit Court of Appeals, concluding that a debtor may not strip down a creditor's lien on real property to the value of the collateral, as judicially determined, when that value is less than the amount of the claim secured by the lien.

When Congress amends the bankruptcy laws, it does not write "on a clean slate." *See Emil v. Hanley,* 318 U.S. 515, 521 [63 S.Ct. 687, 690–91, 87 L.Ed. 954] (1943). Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussions in the legislative history. See *United Savings Assn. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 380 [108 S.Ct. 626, 634–35, 98 L.Ed.2d 740] (1988). See also *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 563 [110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990)] (slip op. 9); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 244–45 [109 S.Ct. 1026, 1032–33, 103 L.Ed.2d 290] (1989).

*Dewsnup,* 112 S.Ct. at 779 (citations included). Justice Blackmun further noted that given the ambiguity in section 506(b), silence in the legislative history cannot be controlling:

> [T]o attribute to Congress the intention to grant debtors a broad new remedy against allowed claims to the extent that they become "unsecured" for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible, in our view, and is contrary to basic bankruptcy principles.

*Id.* Likewise, congressional silence regarding codification of the new value exception cannot be interpreted as eliminating a substantial, judicially created exception to the absolute priority rule especially when § 1129(b)(2) is not ambiguous on its face.

In *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the Court discussed Congress' codification of the judicially created power to abandon burdensome estate assets. The Court explained that unless a specific intent to change the law is manifest, it is presumed that congress did not intend to make such a change:

> The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.

*Id.* at 501, 106 S.Ct. at 759 (citations omitted). *Accord, Kelly v. Robinson,* 479 U.S. 36, 50–51, 107 S.Ct. 353, 361–62, 93 L.Ed.2d 216 (1986) (interpreting dischargeability of restitution for criminal acts). If Congress had intended to eliminate the new value exception, it would have made "that intent specific." *Midlantic,* 474 U.S. at 501, 106 S.Ct. at 759; *see also Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 813, 109 S.Ct. 1500, 1506, 103 L.Ed.2d 891 (1990) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts."). Absent a showing of specific intent to change the judicially created new value exception, especially considering the plain language of the statute, it is not necessary in this case to "venture into the thicket of legislative history" to determine the scope of § 1129(b)(2). *O'Connor,* 942 F.2d at 773.

Conversely, many courts have investigated the legislative history regarding the absolute priority rule to determine the statutory purpose of § 1129(b)(2). These courts conclude that there is nothing in the legislative history of the 1978 Code or in the language of section 1129(b)(2) which suggests that Congress intended to modify past judicial interpretation of the absolute priority doctrine or its new value exception. *See In re Triple R Holdings, L.P.,* 134 B.R. 382 (Bankr.N.D.Cal.1991); *In re Tallahassee Assocs., L.P.,* 132 B.R. 712, 717–18 (Bankr.W.D.Pa.1991); *In re Pullman Constr. Indus., Inc.,* 107 B.R. 909, 946–48 (Bankr.N.D.Ill.1989).

In *Pullman,* the court also addressed an important policy concern weighing in favor of recognizing the continuing vitality of the new value exception. The facts before the *Pullman* court involved confirmation of a

complex plan to reorganize a multi-million dollar estate over the objections of several unsecured creditors. In its examination of the continuing viability of the new value exception, the court in *Pullman* recognized that an infusion of new capital may be required in order for a reorganization to take place, especially when a small business entity is involved. *Pullman* emphasized that individual statutory provisions must be interpreted in light of the statute as a whole. *Pullman*, 107 B.R. at 946–47 (citing *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985)). *Pullman* noted that:

> [T]o read § 1129(b)(2)(B)(ii) as the U.S. Trustee and the [unsecured creditor] suggest would foreclose Chapter 11 as a realistic option for closely held corporations and other small business entities. If, ... the only option available for owners of such businesses to preserve their ownership interest is to pay dissenting unsecured creditor in full under § 1129(b)(2)(B)(i), then as a practical matter there should be little incentive in most cases for the owners of such businesses to undergo the cost and effort of reorganization instead of liquidating and starting over.

*Pullman*, 107 B.R. at 947. The interpretation of section 1129(b)(2)(B) must be weighed in the balance of the legislative purpose of Chapter 11 to rehabilitate rather than liquidate. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984) ("... The policy of Chapter 11 is to permit successful rehabilitation of debtors....").

*Pullman, Triple R Holdings* and the bankruptcy court's decision in *In re Greystone III Joint Venture*, 102 B.R. 560 (Bankr.W.D.Tex.1989), provide thorough investigations into the absence of commentary regarding the new capital doctrine in the Code's legislative history which shall not be repeated here. In summary, these courts concluded that, in light of Supreme Court's observation in *Midlantic* and now reinforced by *Dewsnup*, Congress makes its intent specific if it means to change the interpretation of a judicially created con-

cept and there is nothing in the underlying philosophy of Chapter 11 that requires exclusion of existing equity holders' participation in the successor Chapter 11 debtor. *Pullman*, 107 B.R. at 947–48; *Greystone*, 102 B.R. at 574–75. Furthermore, the notion that the definition of "fair and equitable" is no longer a matter of common law and that section 1129(b)(2) "defines" it expressly is not supported by the legislative history. *Triple R Holdings*, 134 B.R. at 387–91.

### Split of Authority Among the Circuits

Various circuit courts have addressed the viability of the new value exception with differing results, although not all courts deciding this issue have carefully analyzed the issue in light of statutory construction, legislative history, or bankruptcy policy. *See In re Anderson*, 913 F.2d 530 (8th Cir.1990) (affirmed district court's conclusion that debtors failed to meet their burden of showing a contribution that could be recognized under the new value exception); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir.1986) (assumed the survival of the new value exception); *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986) (assumed new value exception survived). The Seventh Circuit, notwithstanding *Potter Material Service* has articulated that whether the new value exception to the absolute priority rule survived the codification of the Code in 1978 is an open question in the Seventh Circuit. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990); *In re Stegall*, 865 F.2d 140 (7th Cir.1989).

The Fifth Circuit Court of Appeals widened the rift between the lower and circuit courts with its opinion in *Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 948 F.2d 134 (5th Cir.1991). The *Greystone* facts are common to most single asset cases where one under-secured creditor with an interest in the debtor's asset can control confirmation of the plan through the vote of its unsecured claim.

Recently, a majority of the Fifth Circuit panel voted to grant partial rehearing on appeal. The panel withdrew and deleted from its prior opinion all discussion of the new value exception. The panel emphasized that the bankruptcy court's opinion on the new value exception to the absolute priority rule was vacated and the panel expressed no view whatever on that part of the bankruptcy court's decision. *Greystone, reh'g en banc denied*, 948 F.2d at 142 (1992).

*Application of the New Value Exception*

▪ This court concludes that there is a new value exception to the absolute priority rule, and that such a provision in SLC V's Plan does not bar confirmation. The issue then becomes whether SLC V's Plan based on the new value exception will produce a "reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376, 108 S.Ct. at 632. The parties continue to litigate various elements of this issue, and have not addressed in detail whether the Plan as structured would meet the requirements of a new value plan. However, to give guidance to future litigation, the court will address the parameters of the exception and the obvious qualification issues riased by the Plan.

▪ In order for the new value exception to apply and for SLC V's plan to be confirmed, the proposed cash infusion must be: (1) necessary for an effective reorganization, and (2) reasonably equivalent in value to the interest in the reorganized debtor that is to be retained by the contributing limited partner. *See Los Angeles Lumber*, 308 U.S. at 121, 60 S.Ct. at 10. Whether SLC V's plan satisfies these requirements depends on its ability, as the proponent of the Plan, to demonstrate by clear and convincing evidence that SLC V's equity holder does not eviscerate the absolute priority rule by means of a contrived infusion and that the elements for "cram down" have been met. *See In re Tallahassee Assocs., L.P.*, 132 B.R. 712, 718 (Bankr.W.D.Pa. 1991); *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr.N.D.Ill.1990).

It is clear that SLC V requires a substantial cash infusion to satisfy its creditors. However, it is not as clear whether the structure of this specific Plan satisfies the requirement that the cash infusion be necessary for an effective reorganization. In this stay lift litigation, SLC V has presented what can only be described as a moving target to Bradford. SLC V adjusts its spread sheet projections on a day to day basis in response to the expert testimony *du jour* regarding market absorption rates, financing costs and other factors crucial to the determination whether a successful reorganization is in prospect. SLC V pegs the amount of cash needed to fund its plan depending on the prevailing testimony. SLC V's most current spread sheet showing total income and expenses, new capital contributions, total of claim payments and cumulative net cash flow, indicates that revenue would not be sufficient to pay operating costs and debt service without the new capital contribution. Therefore, under the most current facts, the capital contribution is probably necessary for an effective reorganization. However, the court makes no ruling regarding whether any capital contribution that provides funding to pay interest to the equity holder is necessary for reorganization.

The new value exception also requires that the contribution be reasonably equivalent in value to the interest in the reorganized debtor that is to be retained by the contributing investor. In *Bjolmes Realty*, the court identified several areas of uncertainty regarding valuation of the retained interest that makes the application of the new value exception very problematic. *Bjolmes Realty*, 134 B.R. at 1008–09.

▪ element courts have applied to valuation is whether the contribution is substantial. *U.S. Truck*, 800 F.2d at 588; *Potter Material Serv.*, 781 F.2d at 101. SLC V's Plan provides a $62,500 new value contribution. Provision for an infusion of $62,500 is not so small that the court can conclude as a matter of law that it is not substantial. Other courts have reviewed whether the contribution is substantial in light of pre-petition claims of the debtor

and the amount of debt to be discharged. *Pullman Constr,* 107 B.R. at 950. SLC V's schedules reflect that it owed approximately $123,000 in tax claims, $2,100,000 in secured claims and $242,000 in unsecured claims at filing. If the reorganized debtor fails to generate a profit, the debt sought to be discharged could be as high as $1,166,000. The capital contribution of $62,500 is approximately three percent (3%) of the total pre-petition debt, and five percent (5%) of the potentially dischargeable debt. This court is unaware of any court that has considered a contribution representing such a small percent of pre-petition debt and debt to be discharged to constitute a substantial contribution under a new value plan.[10] The parties have not yet presented evidence regarding an appropriate capitalization rate to be applied to the stream of earnings projected by SLC V during the Plan, thus a determination of whether the value of the capital contribution is commensurate with the value retained by the investor is not possible.

■ The final analysis will be whether the Plan, in its entire context, is fair an equitable. Whether the court will so rule after evidence and argument regarding the eighteen percent (18%) return to equity prior to payment of unsecured creditors will be left for another day. Certainly, the primary focus of the plan should be to repay creditors and to provide them an opportunity to share in any "up-side" growth of SLC V, prior to any return to equity interest holders. *See In re Kendavis Indus. Int'l, Inc.,* 91 B.R. 742, 750 (Bankr.N.D.Tex.1988); *Pullman Const.,* 107 B.R. at 950. At a minimum, the Plan cannot be "fair and equitable" if most of the risk of loss is shifted to the unsecured class.

These remaining issues are inherently factual, and are more appropriately addressed at future hearings. The court is reluctant to make a determination that SLC V cannot propose a confirmable plan in the case at this point. It is more appropriate to allow SLC V an opportunity to make any necessary refinements and modifications to the Plan and present evidence regarding the value and necessity of the new capital contribution.

## CONCLUSION

■ Section 1129(b)(2) requires that the treatment accorded a dissenting class of creditors be fair and equitable in order for a plan to be confirmed. The term "fair and equitable" has been judicially interpreted to include both the absolute priority rule and its accompanying new value exception. Nothing in the statute, the legislative history, nor in the underlying philosophy of Chapter 11, requires exclusion of existing equity holders' participation in the successor Chapter 11 debtor if the rigorous conditions of the new value exception are met. It may be possible for SLC V to propose a plan that is consistent with the new value exception and it is premature to grant Bradford's motion at this time. It is therefore

ORDERED, that the portion of Bradford's motion for relief from the automatic stay, dismissal, or conversion to Chapter 7 premised upon a violation of the absolute priority rule is therefore, DENIED without prejudice.

10. In *In re Aztec, Co.,* 107 B.R. 585 (Bankr. M:D.Tenn.1989), one of the few cases to find a contribution sufficient to satisfy the requirements of the new value exception, the court considered factual circumstances similar to the instant case. In *Aztec Co.,* the court found the value of an apartment complex, the debtor's single asset, to be $1,700,000. The court's valuation of the real property created unsecured deficiency claims of approximately $950,000. The court found that an additional $500,000 invest-

ment by the joint venturers to be far in excess of the value of the interest that the venturers would retain in the reorganized debtor, and that the contribution was sufficiently substantial to meet the new value exception. In this case, SLC V's single asset is valued at $1,370,000. The unsecured debt is approximately $1,166,000 including Bradford's unsecured claim. The cash infusion is $125,000, as opposed to the $500,000 provided in the *Aztec* case.